**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CORP GROUP BANKING S.A., *et al.*,[1] | Case No. 21-10969 (JKS) |
| Debtor. | |

**DECLARATION OF DAVID S. FLUGMAN IN SUPPORT OF MOTION TO ENFORCE**
**ORDER CONFIRMING THE SEVENTH AMENDED JOINT PLAN OF LIQUIDATION**
**OF CORP GROUP BANKING S.A. AND ITS DEBTOR AFFILIATES**

I, David S. Flugman, do hereby declare, under penalty of perjury under the laws of the

United States of America, that the following is true and correct to the best of my knowledge and

belief:

1.      I am a member of the law firm of Selendy Gay Elsberg PLLC, counsel for Álvaro

Saieh Bendeck, Jorge Andrés Saieh Guzmán, María Catalina Saieh Guzmán, Pilar Dañoebeitía

Estades, and Andrés Winter Salgado (together, the "Movants").  I submit this Declaration in

support of the Movants' motion, filed contemporaneously herewith, to enforce this Court's

Confirmation Order against MBI Servicios Financieros Limitada ("MBI Servicios") (the

"Motion").[2]

2.      Attached as Exhibit A is a certified translated version of a true and correct copy of

a Chilean instrument known as a *querella* filed by MBI Servicios, dated January 16, 2023.  A true

and correct copy of the original Spanish version is attached as Exhibit A-1.

---

[1] The last four digits of the Debtor's foreign tax identification number are 900-8. The Debtor's
mailing address is Rosario Norte N°660, 22nd Floor, Las Condes, Santiago, Chile. The chapter 11
cases of certain affiliates of the Debtor were closed effective as of April 28, 2023. *See* Case No.
21-10969, Docket No. 974.

[2] Terms not defined herein have the same definition as in the Motion.

3.      Attached as <u>Exhibit B</u> is a certified translated version, with annotations, of a true and correct copy of an article published in the Chilean newspaper *El Mercurio* by Jessica Marticorena, dated April 16, 2023.  A true and correct copy of the original Spanish version is attached as <u>Exhibit B-1</u>.

Dated:   New York, New York
         August 18, 2023

                                   /s/          *David S. Flugman*
                                                David S. Flugman

2

# Exhibit A

IN THE MAIN: criminal complaint for crimes set forth;

IN THE FIRST SUPPLEMENTAL PLEADING: accompanying legal status;

IN THE SECOND SUPPLEMENTAL PLEADING: request for indicated proceedings;

IN THE THIRD SUPPLEMENTAL PLEADING: form of notification; and

IN THE FOURTH SUPPLEMENTAL PLEADING: to be taken into account.

**SUPERVISORY JUDGE IN PRELIMINARY PROCEEDINGS OF SANTIAGO (4TH)**

**CARLOS CORTÉS GUZMÁN**, ID No. 10.068.803-4, attorney, domiciled at Avda. Apoquindo No. 3721, Off. 33, Las Condes township, acting as judicial representative and representing (i) **MBI CORREDORES DE BOLSA S. A.**, Tax ID No. Tax ID No. [sic] 96.921.130-0; (ii) **MBI FINANCIAL SERVICES LTDA.**, Tax ID No. 77.239.990-1; (iii) **MBI GENERAL ADMINISTRATOR OF FONDOS S.A.**, Tax ID No. 99.543.100-9, all companies whose line of business is as implied by their names; (iv) **MBI DEUDA PLUS FONDO DE INVERSIÓN**, Tax ID No. 76.052.365-8; (v) **MBI DEUDA TOTAL FONDO DE INVERSIÓN**, Tax ID No. 76.464.001-2; (vi) **MBI RENTA FIJA PLUS DÓLAR FONDO DE INVERSIÓN**, Tax ID No. 76.052.357-7; (vii) **MBI DEUDA LATAM FONDO DE INVERSIÓN**, Tax ID No. 76.543.221-9; (viii) **MBI DEUDA PRIVADA FONDO DE INVERSIÓN**, Tax ID No. 76.797.452-3, (ix) **MBI RENDIMIENTO TOTAL FONDO DE INVERSIÓN**, Tax ID No. 76.756.963-7, public investment funds administered by MBI Administradora General de Fondos S. A.; all being domiciled at Avda. Presidente Riesco No. 5711, 4th floor, Las Condes township, hereinafter interchangeably as "the plaintiff" or "my clients", I would respectfully tell your Honor:

That, pursuant to the provisions of Articles 111 and following of the Code of Criminal Procedures, I come to file a criminal complaint a g a i n s t ÁLVARO JOSÉ SAIEH BENDECK, ID No. 5.911.895-1, domiciled at Calle Rosario Norte, No. 660 23rd Floor, Las Condes, Santiago, and against all those who are responsible as co-perpetrators, accomplices and accessories-after-the-fact, for having committed repeated crimes of executing a simulated agreement, having been consummated and as perpetrator thereof, of Art. 471 No. 2 of the Criminal Code; notwithstanding the final legal classification the Court makes on the facts; all the above according to the factual and legal premises I shall now state:

## I.- REGARDING THE FACTS.
### BACKGROUND.

**Regarding my clients.**

1. <u>MBI Corredores de Bolsa S.A.</u> -hereinafter MBI Corredores- was incorporated on May 4, 2000, before Notarial Attorney Mr. Humberto Santelices Narducci, pursuant to articles of incorporation published in the Official Government Gazette on May 18, 2000, and recorded in the Santiago Commercial Registry on page 11653 No. 9419 of that same year.

2. MBI Corredores was registered in the Registry of Stockbrokers and Securities Agents of the Commission for the Financial Market on June 1, 2001, under number 176. The company's purpose consists of carrying out securities brokerage transactions, under the terms of Article No. 24 of Law No. 18,045, the Law of the Stock Market, as well as performing complementary activities authorized by the Commission for the Financial Market.

3. I hereby state that part of MBI Corredores de Bolsa S. A.'s capital is invested through its own portfolio- in the MBI Plus Dollar Investment Fund (CFIMBIRFUS).

4. <u>MBI Administradora General de Fondos S. A.</u>, hereinafter MBI AGF, was incorporated in 2003 as a closely-held company and is subject to the provisions of Law No. 20,712, on the Administration of Third Party Funds and Individual Porfolios, the regulations thereof being issued by S.D. of the Treasury Department No. 129 of 2014 and the required instructions issued by the Commission for the Financial Market (CFM).

5. MBI AGF was incorporated by means of notarially recorded document on October 31, 2003, before Notarial Attorney Humberto Santelices Narducci. An excerpt of said incorporation was published in the Official Government Gazette on December 17, 2003 and was registered in the Commercial Registry of the Real Estate Registrar of Santiago on page 37,999, number 28,807 of the same year. On December 11, 2003, by means of Exempt Resolution No. 462, the Commission for the Financial Market authorized the existence of and approved the company's bylaws.

6.   I hereby state that the capital of MBI AGF SA -in part- is invested in shares of the investment funds MBI Deuda Total (CFIMBIDT) and MBI Deuda Privada (CFIMBDPA).

7.   According to the bylaws and the authorization of existence from the Commission for the Financial Market,  MBI AGF SA manages, among others, the following public investment funds: (i) MBI Deuda Plus Fondo de Inversión, (ii) MBI Deuda Total Fondo de Inversión, (iii) MBI Renta Fija Plus Dólar Fondo de Inversión, (iv) MBI Deuda Latam Fondo de Inversión, (v) MBI Deuda Privada Fondo de Inversión and (vi) MBI Rendimiento Total Fondo de Inversión.

8.   MBI Deuda Total Fondo de Inversión invests a minimum of 95% of its assets in local fixed income instruments, or funds having the main objective of investing in national fixed income instruments. The shares are traded on the Santiago Commercial Stock Exchange and its shares are listed in the stock market. The Benchmark of the fund is RiskAmerica Corporativo 2Y.

9.   MBI Deuda Plus Fondo de Inversión seeks to generate absolute long-term returns, investment mostly in fixed-income instruments that ensure low volatility and adequate predictability of the Fund's returns. The fund adds value -Plus- by investing up to 15% of its assets in financial instruments, such as shares, local and international derivatives, based on the market outlook of MBI's investment team on currencies, stocks and commodities . The Fund seeks to generate annual returns at a level consistent with the Monetary Policy Rate (MPR) of the Central Bank of Chile, plus 4% annually. The custodian of the Fund's assets is the DCV and its transactions are backed up by systems contracted to the Santiago Stock Exchange.

10.  MBI Deuda Privada Fondo de Inversión invests mainly in asset-backed debt instruments and securities issued mainly by Chilean companies, as well as investment fund shares, both domestic and international.

11.  MBI Deuda Latam Fondo de Inversión is geared toward creating an investment porfolio based on debt instruments, issued in US dollars, by entities domiciled in

countries in Latin America, Central America and the Caribbean, or which have the largest part of their assets, sales or activities which form the main source of their businesses in said geographic area. The fund seeks to maintain a high level of indexing with respect to JP Morgan CEMBI Latam Broad Diversified bonds index.

12. MBI Renta Fija Plus Dólar Fondo de Inversión invests mainly in fixed-income instruments which ensure a relatively low volatility and appropriate predictability of the Fund's income. The fund adds value -Plus- by investing up to 15% of its assets in financial instruments such as shares, local and international derivatives, based on the market vision of MBI's investment team regarding currencies, stocks and commodities. The Fund seeks to generate annual returns consistent with the Monetary Policy Rate of the Federal Reserve of the US (Fed Fund) plus 3% annually expressed in dollars. The custodian of the fund's assets is the DCV and its transactions are backed up by systems contracted to the Santiago Stock Exchange.

13. MBI Rendimiento Total Fondo de Inversión (was absorbed by MBI DEUDA PLUS FONDO DE INVERSION in September of 2022)

### CGB Group and Affiliates.

14. CorpBanca is a financial institution which traces its history back to 1871, the year in which it began operating under the name Banco de Concepción. Over the years the Bank has been controlled by various institutions and individuals, including CORFO and SONAMI. In 1995 a group of investors, led by the defendant, by means of INFISA (currently CGB Group and Affiliates) took ownership control of the Bank.

15. In 2020 the controlling group had a presence in - besides the banking industry- retail businesses, with companies such as SMU, OK Market and Construmart, among others; in the real estate business with mall and strip centers; and in the communications sector with a presence in national circulation newspapers and radio stations.

16. The "CGB and Affiliates" Group is composed of the parent company - Corp Group Banking S. A., hereinafter CGB-, a direct affiliate, owning 100% of the company Inversiones CG Financial Chile Dos SpA (ICGF-Chile2) and two

indirect affiliates, also controlled 100% by means of such, CG Financial Chile SpA (CGF-Chile) and CG Financial Colombia SAS (CGF-Colombia). As a result, CGB parent company controls 100% of its three affiliates (its "Affiliates").

17.   CGB is the largest company within CGB and Affiliates: as of September of 2020, it individually held 93% of the consolidated book assets of CGB and Affiliates.

**Figure 1: Relationship between CBG and its Affiliates**



18.   CGB and Affiliates file consolidated FS which state they were made based on Regulations in effect in Chile (which are compatible with international standards, IFRS). As of September of 2020, its main assets were as follows:

|  | Amount in Millions of CLP | % of total assets | |
|---|---|---|---|
| *Current assets* | | | |
| Cash and cash equivalents | CLP 7 | 0% | |
| Accounts receivable with related companies | CLP 1,756 | 0% | |
| Other current assets | CLP 0 | 0% | |
| | | | |
| *Non-current assets* | | | |
| Investments in Affiliates (a) | CLP 881,125 | 94% | |
| Assets from Deferred Taxes | CLP 51,151 | 0% | |
| Other non-current assets | CLP 1 | 0% | |
| | | | |
| **Total assets** | **CLP 934,040** | **100%** | |

| *(a) Investments in affiliates are shown in shares in the following companies (CGB's and Affiliates' interest in them shown in parenthesis):* | | | *How much is in CGB parent company and not in its Affiliates* |
|---|---|---|---|
| SAGA (43.2%) | CLP 136,571 | 15% | 15% |
| Itaú CorpBanca (26.6%) | CLP 663,131 | 71% | 71% |
| Itaú CorpBanca Colombia 10.3) | CLP 61,532 | 7% | 1% |
| Fondo de Inversión Privada Corp Life (42.5%) | CLP 19,891 | 2% | n/s |
| **Total investments in affiliates** | **CLP 881,125** | **94%** | |

Note: Information was obtained from CGB's FS. These provide mainly consolidated information among it and its affiliates, thus it is impossible to separate how much corresponds to CGB assets and how much corresponds to each of its affiliates for each item.

19. CGB and its Affiliates are investment companies whose main asset in 2020 - reflecting 94% of the total consolidated assets- are financial investments and specifically in shares of companies they do not control ("Affiliates"). <u>Therefore, the income flow from their business is mainly dividends coming from investments in affiliate companies.</u> Depending on the specific company, CGB and Affiliates hold between 10% and 43% of the shares of the affiliate companies. The largest of these investments in 2020 was in the Banco Itaú CorpBanca (hereinafter ITCB), which amounted to up to 26.6% of the capital of said bank and on its own represents 71% of the total consolidated assets of CGB and Affiliates.

20. One aspect that should be noted regarding the assets of CGB and Affiliates is that they have pledged a very significant part of the assets in affiliated companies which form part of its equity. Specifically, CLP 488,759 million of the CLP 631,131 million invested in shares of Itau CorpBanca are pledged (that is, 74% of said shares). Likewise, CGB and its affiliate CGF-Colombia have pledged 100% of the CLP 61,532 million they have invested in shares of the bank Itau CorpBanca Colombia. CGB and Affiliates have given these pledges as security for loans granted by third party creditors to related companies.

21. CGB's main current liability is the BOND it placed in the international market in 2013: CLP 14,320.- million pertaining to accrued and unpaid INTEREST and CLP 393,563.- million pertaining to the bond CAPITAL which, added together represent 83% of the total current liabilities of CLP 492,386 million. All this according to values as of DEC 31, 2021.

**Regarding related companies:  "Compañía**
**Inmobiliaria y de Inversiones SAGA SpA" and "Inversiones GASA Limitada".**

22.  Inmobiliaria y de Inversiones SAGA SpA, hereinafter interchangeably SAGA, Tax ID No. 88.202.600-0, is a related company of CGB.

23. With respect to SAGA's business activities, information that may be extracted from public records is limited; from CGB's FS we can know its total current assets and net worth, as well as its profit/loss for the fiscal year and the debt CGB has with it; from ITCB's FS, we can discover its investments in said Bank; and from the SEC reports one can see that, just like CGB, it has pledged part of its assets to guarantee obligations of its related companies with third party creditors. SAGA shares -at least in public documents- do not appear to be pledged as security. There are no records with respect to the norms applied in its accounting - for example, whether or not it adheres to the IFRS, and it is not known whether its balance sheet is audited or not.

24. It is important to highlight that in ITAU Corpbanca and Affiliates' FS of 31.DEC.2018, it changed from having 4.0824 % to 2.0036 % of shares in the referenced Bank, that is to say a decrease of 50.92% in its shareholder position. In 2019 it remained the same, it being noted that the company forms part of the "Saieh Family". Subsequently, in 2020 by means of a significant event – new acquisitions of Itaú Unibanco Holding S.A. – Itaú Unibanco Holding S.A. announced that through its affiliate ITB Holding Brasil Participações Ltda., it acquired from Inmobiliaria y de Inversiones Saga SpA (SAGA), the amount of 5,558,780,153.- of Itaú Corpbanca shares, for a total purchase amount of CLP 33,138,103,833.- As a result of this acquisition, Itaú Unibanco increased its shareholder participation in Itaú Corpbanca by approximately 1.08%. Thus, by 2020 SAGA only held 0.92% of Banco ITCB's shares.

25. In the FS as of 31.DEC.2021 there was again a decrease in the number of SAGA's shares in the referenced Bank, and by the end of the fiscal year, it only held 0.48% of the shares.

26. Thus, finally, to properly understand the crime, which is the subject of this complaint, <u>the referenced company SAGA progressively decreased its participation in Banco Itau Corpbanca: i n 2017 and 2018 by 4.0824%; in 2019 by 2.0036%; in 2020 by 0.92%; and lastly, in 2021, by 0.48%</u>

27. For its part, "Inversiones GASA Limitada", hereinafter indiscriminately GASA Tax ID No. 76,034,463-K, is an investment and financial intermediation company, which is controlled by Corpgroup Holding Inversiones Ltda., Tax ID. No. 96.953.290-5.

28. It was incorporated by notarially recorded document dated July 31, 2008, executed before Notarial Attorney José Musalem Saffie. The respective excerpt is recorded in the Commercial Registry of the Real Estate Registrar of Santiago for the year 2008 on page 43,609, number 29,994 and was published in the Official Government Gazette on September 02, 2008. The company has undergone various changes, the last one being recorded in notarially recorded document dated August 29, 2018, executed before Notarial Attorney Iván Torrealba Acevedo, the excerpt of which was recorded in the Commercial Registry of the Real Estate Registrar of Santiago for the year 2018 on page 74,948, number 38,490 and was published in the Official Daily Gazette on October 8, 2018.

**Issuance of Bond (Note) named CGB 13/23.**

29. In May of 2013 Corp Group Banking S. A. issued a bond (ISIN USP31925AD54 called Corp Grp Banking 13/23, hereinafter CGB 13/23) in the amount of US$500,000,000.-, with an interest rate of 6.750% maturing on March 15, 2023. Interest would be paid in March and September of each year. The possibility of redeeming the bond on March 15, 2018 was stipulated.

30  The banks Deutsche Bank Securities and Goldman, Sachs & Co. were named bond administrators. At the time, all issuance documents were published on Luxembourg Stock Exchange's website. It was likewise stated that all information could be requested from CGB, domiciled at Calle Rosario Norte 660 23rd floor, Las Condes, Santiago, attention María Pilar Dañobeitía Estades.

31. It was specifically stated that the issuer of the bond, CGB, is a closely-held company, organized under the laws of the Republic of Chile. It was added that all principal directors and executives reside in Chile.

32. A series of prohibitions or negative agreements was specified for the issuer and its subsidiaries, including:

   a.  Additional debt.

      i)  Corp Group shall not directly or indirectly incur, nor allow any of its subsidiaries to incur additional debt, except for those expressly permitted in the bond.

      ii)  Only those debts issued on the same date as the bond, or which had been issued previously, or those related to the capital required for the banking business, among others are allowed.

   b.  Making certain payments.

      i)  Corp Group shall not make, nor allow its subsidiaries to make, directly or indirectly, payments of any dividends nor make any distribution with respect to the Shares of the Corp Group's capital stock or that of any its subsidiaries to the holders of said capital stock except for:

         (i)  Dividends or distributions payable in Shares of Corp Group Qualified Capital;

         (ii)  Dividends or distributions payable to Corp Group; or

         (iii)  Dividends or distributions to all holders of Capital Stock of a Restricted Subsidiary, based on a prorated calculation or greater than such.

      ii)  To purchase or acquire by any means or withdraw value of any Capital Stock of Corp Group or its related companies;

iii)    To make any payment of capital, to buy, cancel, redeem, pay in advance, decrease or by any other means acquire or withdraw for value, before any scheduled final maturity, scheduled reimbursement or schedule payment from the amortization fund, as the case may be, of any subordinate debt; or to incur additional debt; make certain restricted payments; create liens; and make transactions with related parties.

c.    Restrictions of CorpBanca's distribution of dividends: Corp Group shall vote representing the shares it holds in CorpBanca to the degree allowed by Chilean Law for Corporations, in favor of CorpBanca paying annual dividends to its shareholders for an annual amount equivalent to at least 30% of CorpBanca's net unit [sic] each fiscal year.

d.    Limitations on new liens: Neither Corp Group nor any of its related companies, may encumber, nor allow any encumbrance on all or part of its assets, whether it owns such at the time of the issuance of the bond, or acquires such afterwards. Neither may they encumber the interest, income or benefits arising from said assets, in order to guarantee a current or future debt of Corp Group or its Subsidiaries, without it being clearly and effectively specified that the bonds are guaranteed prior to said debt or in like manner or proportional to such.

e.    Limitation of transactions with controlled companies (Affiliates).

i)    Corp Group may not directly or indirectly carry out, nor allow its Restricted Subsidiaries to carry out any Transaction or series of related transactions (including without being limited to, the purchase, sale, lease or exchange of any good or the provision of any service) with, or for the benefit of, any of the Affiliates of Corp Group, unless:

(i)    The terms of said transaction are more favorable to Corp Group than those which could be expected in a comparable transaction at that time, under free competition conditions, from a non-related person.

    (ii)   In the event that said transaction involves annual aggregate payments, or transfer of goods or services with a Fair Market Value greater than US$10 million, the terms thereof must be approved by the majority of the members of Corp Group's Board of Directors; and

    (iii) In the event said transaction involves annual aggregate payments or goods or services with a Fair Market Value greater than US$20 million, an independent financial advisor must give a favorable opinion with respect to the equity of said transaction in order for it to take place.

    f.   Sale of securities: Corp Group shall not sell, nor shall allow any of its related companies to sell securities, unless they receive Fair Market Value for such at the time of the transaction.

### Investments in the CGB 13/23 Bond.

33.  The investment funds (i) MBI Deuda Plus Fondo de Inversión, (ii) MBI Deuda Total Fondo de Inversión, (iii) MBI Plus Dólar Fondo de Inversión, (iv) MBI Deuda Latam Fondo de Inversión, (v) MBI Deuda Privada Fondo de Inversión and (vi) MBI Rendimiento Total Fondo de Inversión invested in the aforementioned bond.

34.  According to the DCV certificates, the positions of the plaintiff as of November 2020 were as follows:

    (i)   Certificate of position No. 350892, corresponding to account 76038031, in instrument code USP31925AD54, with a nominal available position of US$30,566,000.0000.

    (ii)   Certificate of position No. 350894, corresponding to account 76038040, in instrument code USP31925AD54, with a nominal available position of US$895,000.0000.

    (iii)  Certificate of position No. 350890, corresponding to account 76038023, in instrument code USP31925AD54, with a nominal available position of US$2,100,000.0000.

    (iv) Certificate of position No. 399, corresponding to account 72652274, in instrument code USP31925AD54, with a nominal available position of US$5,840,000.0000.

(v) Certificate of position No. 350898, corresponding to account 76038090, in instrument code USP31925AD54, with a nominal available position of US$2,730,000.0000.

(vi) Certificate of position No. 350897, corresponding to account 76038066, in instrument code USP31925AD54, with a nominal available position of US$6,830,000.0000.

35. According to the certificate as of 03.NOV.-2020 issued by Brown Brothers Harriman, corresponding to account 3550100 and ID B824K72, MBI Deuda Latam FDI fund, has a nominal position of US$3,080,000.-

36. Furthermore, it should be noted that MBI CORREDORES DE BOLSA S.A., also a plaintiff, invested directly in the aforementioned bond. As of November of 2020, it maintained a nominal position of US$1,000,000, according to Portfolio Number: 30221 issued by BTG Pactual Cayman

37. Ultimately, the total nominal investments of my clients in the "CGB 13/23 Bond" amounted to the sum of US$ 53,041,000.-.

## FACTS CONSTITUTING THE CRIME.

38. Between 2016 and 2020 the defendant arranged for CGB to sign a series of subscription and purchase/sale agreements for SAGA shares with its related companies, SAGA and GASA, all of which are simulated, since the real intent of the controlling company was to remove assets from CGB and not to acquire the referenced shares. The manner in which it implemented this asset stripping, was in order to not violate the prohibitions or obligations which were not [sic] established in the bases of the bond on the one hand, and on the other, to leave CBG [sic] without assets, and ultimately place the bond issuer in bankruptcy proceedings, but with no assets. The criminal plan was such that the resources already placed in SAGA, were used by the defendant for his benefit or that of one of his family of companies. It involved executing a series of agreements to transfer shares in a total amount of approximately CLP 164,735,000,000. It meant the stripping of CGB's assets, which was done to the detriment of the bondholders. That is, of the CGB 13/23 Bond creditors. In conclusion, the bond issuer divested itself of all its assets.

39. In order to completely understand the foregoing, it is necessary to show the existing corporate relationship between CGB, SAGA and GASA - all companies which form part of a conglomerate which depend on the same controlling company, Corpgroup Inversiones Limitada and, ultimately, the defendant Álvaro Saieh Bendeck.

40. Between the years 2016 and 2020, CGB made a series of shares transactions of its related company SAGA, for amounts totaling (CLP 164,735.- million) as of September of 2020, it amounted to 37% of the net worth of such. By means of said transactions, CGB increased its participation in Saga, from 0% in 2016, to 43% in the month of September of 2020, acquiring shares of said company for the aforementioned amount.

**Graph 1: Growth of CGB's interest in SAGA**

(% of SAGA shares in CGB's hands)



41. Specifically, <u>CGB made a series of purchases and subscriptions for shares in SAGA,</u>

as follows:

| DATE | TRANS ACTION | COUNT ER PARTY | NEW | NO. SHARES | AMOUNT (CLP MILLION) | PRICE PER SHARE |
|------|-------------|----------------|-----|------------|----------------------|-----------------|
| JULY 2020 | Purchase | GASA | NO | 1,433,295,569 | CLP 2,560 | CLP 1.79 |

| | | | | | | |
|---|---|---|---|---|---|---|
| JUNE 2020 | Purchase | GASA | NO | 2,709,548.695 | CLP 4,767 | CLP 1.76 |
| MARCH & APRIL 2020 | Purchase | GASA | NO | 19,215,669,632 | CLP 33,663 | CLP 1.75 |
| APRIL 1 2019 | Purchase | SAGA | YES | 1,005,064,520 | CLP 2,000 | CLP 1.99 |
| SEPT 14 2018 | Purchase | GASA | NO | 5,224,480,449 | N/D | N/D |
| APRIL 13 2018 | Purchase | SAGA | YES | 4,076,860,267 | CLP 8,963 | CLP 2.20 |
| FEB 2018 | | SAGA | | 1,991,393,169 | CLP 4,378 | CLP 2.20 |

Detail:

| | | | | | | |
|---|---|---|---|---|---|---|
| 26.FEB.18 | Subscription | SAGA | YES | 429733007 | | |
| 15.FEB.18 | Subscription | SAGA | YES | 461392901 | | |
| 19.FEB.18 | Subscription | SAGA | YES | 472169191 | | |
| 13.FEB.18 | Subscription | SAGA | YES | 628098004 | | |
| 4T 2016 | Purchase | SAGA | YES | 16,442,162,746 | CLP 40,598 | CLP 2.47 |
| 3T 2016 | Purchase | SAGA | YES | 7,511,112,973 | CLP 18,988 | CLP 2.53 |
| 2T 2016 | Purchase | SAGA | YES | 19,103,786,935 | CLP 48,818 | CLP 2.56 |

| | | |
|---|---|---|
| **TOTAL PESOS** | | **CLP 164,735** |

48. As a result of said transactions, CGB divested itself of practically all its assets, producing damage to its net worth due to the acquisition of shares at a purchase price higher than the financial value of said investment.

49. It should be noted - as we have already mentioned - that GASA is a company controlled by CGB.

50. Likewise, and with respect to the market price of SAGA's shares, the accounting asset of this company's net worth was valued at an amount greater than its actual economic value (asset valued for accounting purposes above its economic value), which translates into a book value for the share which is greater than its market price (book value is the value of its accounting equity divided by the total of its subscribed and paid shares).

51. This assertion is based by the following:

   a. The shares of Itaú Corpbanca (ITCB) held by SAGA are valued in their books higher than its stock quote;

   b. The book value of the SAGA shares would not include the decrease in the value of ITCB shares given as collateral to guarantee outside loans;

   c. CGB's financial statements show that more than half of SAGA's assets were made up by other non-identified assets (which, presumably would include shares or interest in related companies, regarding which the same consideration with respect to the difference between the market value and the book value should be applied);

   d. SAGA had granted bonds and created joint debts to guarantee loans of related companies (a circumstance which increases the liability of said company and which would be not taken into account in the book value of its shareholder equity);

   e. The book value of SAGA's shares would not include the discount which should be made on the market price of the shares that do not grant control over the company; and

   f. The existence of shareholder agreements restricting the use of the shares would not be included in the book value of the shares.

52. Therefore, the purchase of SAGA shares - was directly prejudicial for CGB. The latter was certainly in a situation of financial strain which worsened over time. So much so, that CGB's credit risk classification was lowered (a recognized indicator of financial strain), at the time when it was progressively increasing its share in the related company SAGA. In effect, between the end of 2016 and middle of 2020, CGB's classification decreased from category B to CCC.

**Application of the law to the specifics in the case.**

53. Upon noting the aforementioned background, the only conclusion is to again mention the simulated transactions, which include the crime of simulated agreements in light of the events described. Thus, according to known facts, between the years of 2016 and

2020 CGB made a series of transactions for shares of its related company, SAGA, the amounts of which (by September of 2020) were CLP 164,734 million, equivalent to 37% of the accounting net worth of such. Over this period of time, CGB increased its interest in SAGA, from 0% in 2016 to 43% by September of 2020.

54. The referenced transactions consisted of share purchase/sale agreements between CGB and SAGA, on the one hand, and between CGB and GASA or another related company on the other hand, by means of which CGB acquired SAGA shares at a specific price. In this regard, it should be noted that a purchase/sale agreement is a bilateral legal action, creating obligations, which perfectly fit the term "agreement" used by the legislature in Article 471 No.2 of the CP.

55. With respect to the punishable conduct of the crime, the legislature requires that an agreement be issued, for which - according to what has been chiefly understood- it would suffice that such be executed, thus fulfilling the formalities of the action involved. In this case, purchase/sales of first issuance shares were carried out (transactions carried out up to 2019) and already existing ones (transactions carried out in 2020), in which, according to information known, the legal formalities required by law would have been observed.

56. With respect to existence of the concept of simulation in the reviewed facts, it should be remembered that the latter exists to the degree that the intent stated in the simulated business differs from the actual intent of those taking part in the document. Thus, notwithstanding the classic concept that includes the hypotheses of absolute and relative simulation, with clear assumptions that the action should include (persons, terms, nature and existence of the document), for purposes of estimating the crime envisioned in 471 No. 2 in light of the foregoing, it being understood that in this group of cases we are seeing transactions which were effectively carried out- and following the doctrine in the sense and scope attributed to the concept of simulation, the difference between the actual intent and the stated intent is found in the scope of intent of those involved in executing the document. There is relative simulation when there is a difference between what is stated by the parties as being regulating standards for their opposing interests, and the actual form or manner for regulating said relationship to which they actually agree. Thus, from this point of view, and appealing to the practical ends associated with the legal transaction of a purchase/sale agreement, it is possible to show an obvious discrepancy between what the executing parties state- which is implicit in this type of agreement - and their real intention at the time they executed said documents.

57. The purchase/sale agreement is essentially an instrument for remuneration, in the framework of which the contracting parties seek a reciprocal use or benefit. In this sense and - as was previously referenced - if we consider the meaning given in the Civil Code for the concepts of "for gainful purpose" and "for valuable consideration" as being distinct concepts, and, from that point of view, give substance to the concept of "reciprocal" with respect to agreements such as purchase/sale contracts, we may affirm that CGB's acquisition of illiquid shares, such as those of its related company SAGA- a circumstance known by such and by GASA at the time the transactions were carried out - at a price higher than the market price (given that its book value asset would be counted at a value higher than its economic value), in a context of financial strain, it is completely evident that the sole intention of underlying said transactions was to divest CGB's net worth of liquid assets and, in return, to benefit its related companies in the conglomerate- and as an ultimate consequence, to considerably decrease CGB's value, to the detriment of third parties, in this case, the plaintiffs.

58. It can be concluded, from the fact that the purchases of illiquid shares from a related company, at a higher than market price, were carried out under the aforementioned terms, that the true intention underlying the transactions was to cause damage to those who were in a legal relationship with the victim of the action (the creditors of the bond agreement), making it actually impossible to fulfill the contractual obligations regarding such- and, thus, to benefit the related companies with the money diverted to them. In other words, from the terms of the purchase/sale agreements that were executed, it is clear that CGB's intent, in spite of such being basically for remuneration, was to move its assets to a related company, in exchange for shares in the latter, which had practically no value at all, in order to ultimately divert said assets from SAGA to individuals and entities related to the defendant.

59. We should remember that - in conjunction with the increase of interest in SAGA from 0% to 43% - at the same time, the defendant arranged for SAGA to get rid of shares in Banco ITCB, going from having 4.0824% in 2018 to 0.48% in 2021.

60. To continue with the analysis of the application of the law and in order to affirm the applicability of the premise of simulation to the facts under analysis, it is possible to likewise sustain the difference between the stated purpose and the actual one in the elements/requirement for validity of the legal act: a lawful purpose. As has already been stated, the motive of the contracting parties does not consist of a non-legal element, but rather, to the contrary (as has been sustained in the majority of our doctrine) it constitutes the degree to which it can be verified whether a legal action has or does not have a lawful purpose. In this regard, the various transactions, carried out over a period of time - between the second half of 2016 and July of 2020 - demonstrate that the manifest intent of the contracting parties was precisely that of causing the execution of the documents to appear to be of a legal nature, under circumstances in which the only underlying motive was to strip the company of its value, consequently creating harm to the third parties, and ultimately appropriating said assets for itself.

61. With respect to the typical requirement for harm to third parties, pursuant to the ruling of our Supreme Court, the various transactions carried out between CGB and its related parties caused financial damage to the bondholders. In effect, the impact on the creditor's right to collateral constitutes harm in light of Article 471 No. 2 of the Criminal Code, the impossibility of paying the amount due to the bond holders is fully subsumable in this supposition of harm. Even more so if one considers that as of 2020, CGB stopped paying the contractual biannual interest, and that the bond no longer had the financial backing of its issuer, as it had divested itself of its assets in a series of simulated actions.

**Damages to the investors.**

62. In this regard, and in view of the elements of the concept being considered, the creation of harm which occurs precisely due to the asset stripping which irrevocably prevented CGB from meeting the obligations it assumed, involves the transactions made by CGB (given

that those amounts committed around 40% of its book value net worth) the purpose of which was to transfer the company's assets to its related companies, to the detriment of third parties (asset stripping).

63. Regardless of the fact that it will be the Public Prosecutor's Office which must determine the precise amount of the damages, we should bear in mind that it would be at least USD$ 50,855,711.-, which as of 16.JAN.2023 would be equivalent to the amount of CLP 41,921,888,249.- (according to the value of the dollar that day).

64. In effect, we should bear in mind that the defendant included - within his criminal plan- availing himself of Chapter 11 of the Bankruptcy Code of the United States, both with respect to CGB and SAGA, all before the Bankruptcy Court of the District of Delaware, United States. The case was named "Case No. 21-10969-JKS". Said agreement was made at the SAGA's Shareholders Meeting held in Santiago on June 28, 2021. Mr. Jorge Andrés Saieh Guzmán, the defendant's son appeared at said Meeting. With respect to CGB, the agreement was made at a Special Session of the Board of Directors dated 24.JUN.2021, attended by Jorge Andrés Saieh Guzmán, María Catalin Saieh Guzmán and Roberto Guerrero del Río.

65. Thus, the aforementioned criminal plot, began in 2016, with the execution of the simulated agreements, consistently through 2020, stripping CGB's assets, to then invoke debtor insolvency and request reorganization before a foreign court in 2021. The bond interest was not paid in 2021 and 2022, relying on said procedure (Chapter XI) in which it acknowledged only having resources to pay 4.12% of the bond capital. This is a matter of a complex criminal plot, coldly implemented over time, with the collaboration of various people, some of which are direct family members of the defendant.

66. This is not a matter of an accidental situation or a risk to the company itself, but rather is a case of financial or white-collar crime. The defendant, from this point of view, used instruments of modern finance - bonds - to capture the interest, money from investors, to then begin executing repeated acts of asset stripping, all to the detriment of third parties, the plaintiffs in this case.

**Punishable perpetration.**

67. With respect to the active perpetrator of the crime in question, it can be affirmed that the illegal formulation and structure shows us that any person could be the perpetrator of such; he need not demonstrate specific characteristics to be established as such.

68. Along this line of thinking, and taking into account that a simulated agreement requires an agreement between contracting parties with respect to the document issued to the detriment of third parties, those agreeing to the execution of such shall be considered as co-perpetrators of the crime set forth in Article 471 No.2 of the Criminal Code.

69. The defendant fits having participated in the capacity of perpetrator per Art. 15, No. 1 of the Criminal Code.

<strong>Figure 2: Relationship between CGB, SAGA and GASA</strong><br>(Arrows indicate which company controls the other)



70. The defendant is the controller of Group CGB and Affiliates. According to Art. 97 of the Law of the Stock Market, he is the one who either directly or by mean of other individuals or entities, has an ownership interest and has the the power to take some of the actions set forth in the regulation and, specifically, to decisively influence the management of CGB and SAGA.

71. The information regarding controlling relationships between the companies is obtained from information presented by the defendant to the SEC on the following dates:

1. November 27, 2020, where he indicates: "Interhold is the majority shareholder of CGB. CGHIL is the majority shareholder of Interhold. CGF is the entity which controls (owns) CGHIL. GASA is the majority shareholder of SAGA. CGI is the majority shareholder of CGF and Gasa. CGHIL is the majority shareholder of CGI. Saieh Bendeck is the founder of the Corp Group and could be considered to be the person who controls CGHI and CGF."; and

2. Report dated April 1, 2016, in which he indicates a control structure almost identical to the one illustrated in the figure and specifying that GASA is the sole shareholder of SAGA at that time. Specifically, in this case, it was indicated that: "Interhold is the majority shareholder of CGB. CGHIL is the shareholder of Interhold. CGF is the controlling entity (owner) of CGHIL. Gasa is the sole shareholder of Saga. CGI is the majority shareholder of CGF and Gasa. CGHI is the majority shareholder of CGI. Saieh Bendeck is chairman of the board and the one who controls CGHI, and he is director of CGF. The rest of the defendants are in the investment and securities business.

72. In the bond issuance the following was stated: "Our majority shareholders, led by Álvaro Saieh Bendeck, have more than 20 years' experience in the financial business in Chile. Mr. Saieh, who, along with other members of his family, control approximately 59.4% of the outstanding common stock of CorpBanca (including the shares that we own), he holds common stock with enough power under Chilean law, to substantially approve all CorpBanca's corporate actions subject to the approval of shareholders, including distribution of dividends, and to select the majority of the 9 members who make up the board of directors. Once the pending offer of preemptive rights of CorpBanca is complete, we hope that the ownership interest of Mr. Saieh and his family in CorpBanca will be diluted (or reduced) to approximately 53.0% (assuming the subscription of all rights being offered)."

73. The point regarding the ownership interest of the various executives - mainly directors and general managers - other than the defendant is not a minor point. The Public Prosecutor's Office investigation should determine who agreed to approve the various actions and simulated agreements referenced herein.

74. The legal principle establishes that there is no trouble whatsoever in determining criminal liability for actions of associated bodies. It is no longer an issue of a causation or execution of the actual crime - for example, whoever signed the simulated agreement or drafted it - but rather that of determining who is the *appropriate responsible person* for the relevant criminal action. Thus, the criminal legal responsibility for the act could be a single person or various people, whether vertical or horizontal. All those who act in an objectively criminal context are *responsible* for the crime, according to the *principle of responsibility* the perpetrator is the one having the concrete duties and this gives rise to his criminal liability.

75. There is no doubt that the controller of the financial group has a relevant function, regardless of how close he was to the act. Ultimately, the defendant could very well not have participated in the board meetings, nor executed some of the agreements, but that fact does not mean he is not primarily responsibility for the act. The one who is at the highest position, who has the greatest degree of responsibility, who has the duty to avoid CGB and its Affiliates committing crimes, is the controlling person, who is criminally liable for the responsibilities he holds by virtue of his position. Just as the word itself denotes - *controller* - the full *control of the organization* can be found in the defendant.

76. To reiterate, it would be a matter for the Public Prosecutor's Office's investigation to determine who were the subordinates who participated in the actions, whether family members or not, who materially carried out the various criminal behaviors. Likewise, in what manner and under what circumstances was the controller himself involved in the criminal conduct of the subordinates.

## II.- REGARDING THE LAW.

**Crime of executing a simulated agreement.**

77. The aforementioned described actions constitute repeated crimes of executing simulated agreements, set forth and sanctioned in Article 471 No. 2 of the Criminal Code. The cited regulation penalizes *"The person who executes a simulated agreement to the detriment of another"* with the minimum sentences of imprisonment or confinement to a specific place for the minimum degree or a fine of 11 to 20 monthly tax units.

78. The criminal conduct does not consist of appearing to execute a legal document, but rather of actually executing one, the content of which does not reveal the true intent of the intervening parties, who have not planned or wished to carry out the act or agreement described therein. In this sense, a simulated agreement is present to the degree in which there is a divergence on the one hand, between the intent stated and shown by the contracting parties and, on the other hand, the actual intent of those involved in the act.

79. In this sense Etcheberry understands that a simulated agreement is "that which contains an intent which is not real, made in a conscious manner and by agreement among the contracting parties, to produce the appearance of a legal action that does not exist or is distinct from the one that has actually been carried out".

80. As stated, the notion of simulated business which in its classic formulation includes two general hypotheses; that which consists of the execution of an agreement which in reality does not exist; and that which says it relates to an action which is different to that which was actually executed. Along this line of thought, Francisco Ferrara defines it as "one having an appearance contrary to reality or because it does not exist at all or because it differs from what it appears to be". Under these terms, there would absolutely be simulation "if the parties agree to execute only the appearance of an act which they actually do not want and which, consequently, would not legally exist between them, or in a related manner, if they decide to execute a document or business the appearance of which is only false with respect to its nature, its terms or content, or the persons appearing therein".

81. This type of crime simply requires that a simulated agreement be executed, that is, be established or stipulated, and which thus causes detriment to another person, said detriment must be of a material type. Thus, an agreement was feigned thereby producing a material damage.

82. Whether the simulation is absolute or relative makes no difference (Rivacoba and Rivacoba, Quintano Ripollés and Bustos Ramírez). It is the same in either case, given that the law only requires that it is a matter of a simulated agreement; and, if it causes detriment, it can be considered as having fit the type.

83. For the purpose of considering the crime set forth in 471 No. 2 in light of the foregoing, - it being understood that the purchase/sale of shares involves transactions that were actually made - the element rendering the conduct criminal is based on the difference between the actual and stated intent in the intentional sphere of those involved in executing the instrument. In said scenario, we are faced with a simulated instrument when the parties of a bilateral business [sic], in their relationships. It is not a matter of one party wanting to own the share, rather simply it holds the amount of money set for the price of such. It is not payment for an asset, but rather the means of directly transferring riches from one holder to another.

84. Similarly, in this case there is a discrepancy between the stated intent and the actual intent from the point of view of one of the requirements of a legal document: a lawful purpose. In effect, the relative simulation may also deal with this element of a legal instrument: that, although it says it relates to the motive of the contracting parties, we cannot forget that it also constitutes the measure by which it can be determined whether a document has a lawful purpose or not. A document which appears to have a lawful purpose, in circumstances in which the true underlying intent is none other than to cheat third parties of their rights, constitutes a simulated document pursuant to Article 471 No. 2 of the Criminal Code.

85. The crimes of executing a simulated agreement are found in the degree to which they are consummated. As the national jurisprudence states, the penalized conduct is that of executing the agreement, and for such, it suffices that the contracting parties offer and execute such; it being understood that such takes place when the formalities inherent in the nature of the apparently executed agreement are fulfilled. In this regard, it should be noted that, if by the term "agreement" we should understand, pursuant to the ideas present in civil law, a bilateral legal document for the purpose of creating personal rights or obligation, the criminal legislature does not concretely define the effect the legal

instrument of simulation in question would have, and thus said subject matter could include agreements that in general are executed to the detriment of third parties (legal bilateral documents having the purpose of modifying, creating or extinguishing rights or obligations.) This is a logical result if we consider that the relevance of the criminal type being analyzed is precisely the damage caused upon the execution of the instrument in question.

86.  Furthermore, the criminal classification in question states that by executing the mendacious document a harm must be created to another. According to the majority opinion, the formulation of the crime of simulated agreements as a form of fraud (as improper fraud - since not all elements of fraud would be present in this crime- or fraud by deceit) requires the prejudicial element must be considered as part of the criminal type under consideration; the consummation of the act depends on the causation of harm to a third party. Given this perspective, executing a simulated agreement to the detriment of another comes to be a crime against property, the simulation constitutes merely the modality in order to commit the required property damage. In this regard ETCHEBERRY and GARRIDO MONTT, unequivocally assert that for the configuration of the criminal type under analysis the creation of a property damage must be required.

87.  Contributing to this is the systematic placement of the crime of simulated agreement, as it is included in Title XI of Book Two: Crimes and Simple Offenses against Property. In this regard, although property is not precisely the good being impacted in asset fraud, but rather assets, in so much judicial universality, it is under this heading that the crimes of fraud regulated by our Code are inserted . This is relevant, since the crimes which underlie the protection of assets as a legal good,  require the causation of a harm to a victim to be considered as being consummated.

88.  With respect to the delineations of harm in question, our jurisprudence has ruled in this regard affirming that damage to the creditors' right to collateral would constitute harm, pursuant to 471 No.2 of the Criminal Code. Thus, with respect to the supposition consisting of a debtor - specifically with whom the respective document is signed - outside of the hypothesis regulated in the type of insolvency punishable by 466 of the Criminal Code, executing simulated agreements in order to strip assets, and thus preventing the fulfillment and enforcement of loans from its lenders, our jurisprudence has stated that this does constitute the crime of a simulated agreement under 471 No. 2 of the Criminal Code.

By way of reference, the Supreme Court, Ruling Case No. 657-2002, dated July 9, 2023, affirmed that "the harm, the element of the type of this criminal concept, is the effect that specifically emanates from the fraudulent agreement itself and which in the case at hand was produced, given that said agreement prevents the exercise of the right of collateral of the plaintiff lenders in order to achieve the fulfillment of the judgment that doomed the employer to pay the owed employee benefits for such".

89. On the other hand, the passive person in the crime could also be anyone; the victim does not need to have a specific quality, (and for purposes of legitimacy being harmed by the crime) rather he must simply own the asset that is effected by means of the execution of the simulated agreement. In this regard, and as evident conclusion of the structure of the crime and the notion of simulation, the co-executor of the agreement may not be a victim of said crime, only third parties unrelated to the executed document.

90. With respect to the subjective classification of the crime, the configuration of the simulated agreement is only compatible with the direct malice of the active subject, it being understood that the simulation clearly requires an agreement among those involved in the document.

## JURISDICTION.

91. The simulated agreements were planned, decided upon, approved and executed in the domicile of Group CGB and Affiliates, located at Calle Rosario Norte No. 660, 23rd floor, Las Condes, Santiago.

92. According to the general rules of the Courts' Organizational Code (Art. 14 and following) and in particular, Article 157, this Court has jurisdiction to hear all prior matters that give rise to the pre-trial proceedings, given that said place is within its territorial jurisdiction.

**WHEREFORE**, pursuant to the provisions of Articles 111 and following of the Criminal Code of Procedures, Art. 471 No. 2 of the CP, and relevant criminal regulations;

**WE HUMBLY REQUEST THAT YOUR HONOR** file a criminal complaint against **ÁLVARO JOSÉ SAIEH BENDECK**, already individualized, and against all those responsible as co-perpetrators, accomplices and accessories-after-the-fact; for the commission of repeated crimes of executing simulated agreements, as consummated and in the capacity of perpetrator, according to Art. 471 No. 2 of the Criminal Code, and without prejudice to the legal qualification ultimately made of the facts, all in accordance with the preceding legal and factual background, declare such to be admissible and hand the case over to the Public Prosecutor's Office, in order for an investigation to begin, for the case to be formalized, indicted and that he ultimately be sentenced to the maximum sentence allowed by Law.

**FIRST ADDITIONAL PLEADING**: Be so kind as to consider the following to be attached, digital copy of notarially recorded documents dated January 6, 2023, at the Notarial Office of Iván Torrealba Acevedo, which evidences my capacity to act in representation of MBI CORREDORES DE BOLSA S. A., MBI SERVICIOS FINANCIEROS LTDA., MBI Administradora General de Fondos S.A., MBI DEUDA PLUS FONDO DE INVERSIÓN, MBI DEUDA TOTAL FONDO DE INVERSIÓN, MBI RENTA FIJA PLUS DÓLAR FONDO DE INVERSIÓN, MBI DEUDA LATAM FONDO DE INVERSIÓN and MBI DEUDA PRIVADA FONDO DE INVERSIÓN. The same notarially recorded document evidences the capacity of representation of Sergio Rodríguez Oro.

**SECOND ADDITIONAL PLEADING**: Pursuant to the provisions of Art. 113 of the CPP, I would request that the Public Prosecutor's Office carry out the following investigative measures:

1. Issue an order to investigate to BRIDEC of the Chilean Police Investigators, in order for it to begin to compile all the background information, documents and testimony regarding the punishable act and the perpetrator thereof.

2. For official notification be sent to the Commission for the Financial Market to submit all information in its possession - corresponding to the years 2016 to 2022- for Corp Group Banking S. A. and Compañía Inmobiliaria and Inversiones Saga SpA; and the bond ISIN USP31925AD54, named Corp Group Banking 13/23.

3.- For official notice to be sent to ULDECCO to the National Prosecutor's Office in order to gather information on the family and corporate assets of the Saieh Family, headed by the defendant Álvaro José Saieh Bendeck;

4.- That representatives of Corp Group Banking S. A. and Compañía Inmobiliaria and Inversiones Saga SpA, (i) Jorge Andrés Saieh Guzmán, (ii) María Catalina Saieh Guzmán and (iii) Roberto Guerrero del Río, all domiciled at Calle Rosario Norte No. 660, 23rd Floor, Las Condes, Santiago, be required to voluntarily submit a copy of the accounts of both companies between the dates of 01.JAN.2016 and 31.DEC.2022;

5.- That official notice be sent to the DCV to inform the holders as of 31.DEC.2022- of positions of bond "CGB 13/23" ISIN USP31925AD54.

**THIRD ADDITIONAL PLEADING:** Please note that in accordance with article 31 of the Code of Criminal Procedure, that for purposes of notification, I am specifying the following e-mail addresses ccg@cortesyrodriguez.cl and sro@cortesyrodriguez.cl.

**FOURTH ADDITIONAL PLEADING:** Please note that, in my capacity as an attorney licensed to practice law, I am personally assume responsibility and have a power of attorney in this investigation; and likewise SERGIO RODRÍGUEZ ORO, Tax ID No. 9.909.965-8, of my same domicile, who has signed an Acceptance, also has power of attorney.

| | | | |
|---|---|---|---|
| Sergio Rodríguez Oro | Digitally signed by Sergio Rodríguez Oro Date: 2023.JAN.16 11:20:55 -03'00' | CARLOS CORTES GUZMAN | Digitally signed by CARLOS CORTES GUZMAN Date: 2023.JAN.16 11:30:14 -03'00' |



## TRANSLATION CERTIFICATION

I, Leonardo Duran, am a qualified professional translator of the Spanish and English languages and am certified by the American Translators Association in Spanish to English translation.

I hereby certify that the attached translation is, to the best of my knowledge and belief, a true, accurate and complete translation from Spanish into English of the attached document.

Signed MBI Querella – no highlights (1067311.1)

Leonardo Duran
_____
Leonardo Duran

08/18/2023
_____
Date

American Translators Association
ata
Leonardo Duran
Spanish into English
Certification #488876
Certified Translator

Verify at www.atanet.org/verify

**Magna Legal Services**
Language Services Division
1635 Market Street | 7 Penn Center, 8th Floor | Philadelphia, PA 19103
**Phone:** 866-624-6221 | **Fax:** 866-579-0819
**Email:** LanguageServices@magnals.com | **Web:** www.magnals.com

## FLORIDA ACKNOWLEDGMENT

State of Florida ) ) )
County of __Miami-Dade__

On ___08/18/2023___ before me, _____Mercedez G Robinson_____, by means of
      *Date*                                        *Notary Name*

❑ Physical Presence -- **OR** --

☑ Online Notarization,

personally appeared _____Leonardo Duran_____
                                            *Name(s) of Signer(s)*

❑ personally known to me -- **OR** --

❑ proved to me on the basis of the oath of _____ -- **OR** --
                                         *Name of Credible Witness*

☑ proved to me on the basis of satisfactory evidence: ___***Provided Driver License***___
                                                      *Type of ID Presented*

to be the individual(s) whose name(s) is/are subscribed to the within instrument, & acknowledged to me that they executed the same in their authorized capacity(ies) and by proper authority, and that by their signature(s) on the instrument, the individual(s), or the person(s) or entity upon behalf of which they acted, executed the instrument for the purposes and consideration therein stated.

WITNESS my hand and official seal.

MERCEDEZ G ROBINSON
Notary Public - State of Florida
Commission # HH 83897
Expires on December 13, 2024

Notary Public Signature: _Mercedez G. Robinson_

Notary Name: __Mercedez G Robinson__

*Notarized online using audio-video communication*

## DESCRIPTION OF ATTACHED DOCUMENT

Title or Type of Document: __Translation Certification Leonardo Duran__

Document Date: __08/18/2023__    Number of Pages (w/ certificate): __2__

Signer(s) Other Than Named Above: __N/A__

| Capacity(ies) Claimed by Signer(s) | Capacity(ies) Claimed by Signer(s) |
|---|---|
| Signer's Name: ___Leonardo Duran___ | Signer's Name: _____ |
| ❑ Corporate Officer  Title: _____ | ❑ Corporate Officer  Title: _____ |
| ❑ Partner – ❑ Limited ❑ General | ❑ Partner – ❑ Limited ❑ General |
| ☑ Individual ❑ Attorney in Fact | ❑ Individual ❑ Attorney in Fact |
| ❑ Trustee  ❑ Guardian of Conservator | ❑ Trustee  ❑ Guardian of Conservator |
| ❑ Other: _____ | ❑ Other: _____ |
| Signer Is Representing: ___Leonardo Duran___ | Signer Is Representing: _____ |

N/A

( 2 )

# Exhibit A-1

**EN LO PRINCIPAL:** querella criminal por delitos que indica;

**EN EL PRIMER OTROSÍ:** acompaña personería;

**EN EL SEGUNDO OTROSÍ:** solicita diligencias que indica;

**EN EL TERCER OTROSÍ:** forma de notificación; y

**EN EL CUARTO OTROSÍ:** se tenga presente.

JUEZ DE GARANTÍA DE SANTIAGO (4°)

           **CARLOS CORTÉS GUZMÁN**, Run N° 10.068.803-4, abogado, con domicilio en Avda. Apoquindo N° 3721, of. 33, comuna de Las Condes, actuando como mandatario judicial y en representación de (i) **MBI CORREDORES DE BOLSA S. A.**, Rut N° Rut N° 96.921.130-0; (ii) **MBI SERVICIOS FINANCIEROS LTDA.**, Rut N° 77.239.990-1; de (iii) **MBI ADMINISTRADORA GENERAL DE FONDOS S.A.**, Rut N° 99.543.100-9, todas sociedades del giro de su denominación; (iv) **MBI DEUDA PLUS FONDO DE INVERSIÓN**, Rut N° 76.052.365-8; (v) **MBI DEUDA TOTAL FONDO DE INVERSIÓN**, Rut N° 76.464.001-2; (vi) **MBI RENTA FIJA PLUS DÓLAR FONDO DE INVERSIÓN**, Rut n° 76.052.357-7; (vii) **MBI DEUDA LATAM FONDO DE INVERSIÓN**, Rut N° 76.543.221-9; (viii) **MBI DEUDA PRIVADA FONDO DE INVERSIÓN**, Rut N°76.797.452-3, (ix) **MBI RENDIMIENTO TOTAL FONDO DE INVERSIÓN**, Rut N°76.756.963-7, fondos de inversión públicos  administrados por MBI Administradora General de Fondos S. A.; todos con domicilio en  Avda. Presidente Riesco N° 5711, piso 4, comuna de Las Condes, en adelante indistintamente "la querellante" o "mis representadas", a SS. respetuosamente digo:

           Que, de conformidad a lo dispuesto por los artículos 111 y siguientes del Código Procesal Penal, vengo en interponer querella criminal en contra de **ÁLVARO JOSÉ SAIEH BENDECK**, Run N° 5.911.895-1, con domicilio en calle Rosario Norte N° 660 piso 23, Las Condes, Santiago, y en contra de todos aquellos que resulten responsables a título de coautores, cómplices y encubridores, por la comisión de delitos reiterados de otorgamiento de contrato simulado, en grado de consumados y en calidad de autor, del art. 471 N° 2 del Código Penal; sin perjuicio de la calificación jurídica que en definitiva se haga de los hechos por parte del Tribunal; todo ello de acuerdo a los antecedentes de hecho y de derecho que me permito pasar a exponer:

**I.- ACERCA DE LOS HECHOS.**

**ANTECEDENTES.**
**Acerca de mis representadas.**

1. <u>MBI Corredores de Bolsa S.A.</u> -en adelante MBI Corredores- fue constituida con fecha 04 de mayo de 2000, ante el Notario Público don Humberto Santelices Narducci, según escritura de constitución que fue publicada en el Diario Oficial el 18 de mayo del 2000, e inscrita en el Registro de Comercio de Santiago a fojas 11653 N° 9419 de ese mismo año.

2. MBI Corredores se encuentra inscrita en el Registro de Corredores de Bolsa y Agentes de Valores de la Comisión para el Mercado Financiero con fecha 01 de junio de 2001, bajo el número 176. El objeto de la sociedad consiste en efectuar operaciones de corretaje de valores, en los términos contemplados en el Artículo N°24 de la Ley N°18.045, Ley de Mercado de Valores, pudiendo además realizar las actividades complementarias que la Comisión para el Mercado Financiero autorice.

3. Hago presente que parte del capital de MBI Corredores de Bolsa S. A. se encuentra invertido -a título de cartera propia- en el MBI Plus Dólar Fondo de Inversión (CFIMBIRFUS).

4. <u>La Sociedad MBI Administradora General de Fondos S. A.</u>, en adelante MBI AGF, se constituyó en el año 2003 como sociedad anónima cerrada y se encuentra sujeta a las disposiciones contenidas en la Ley N° 20.712 sobre Administración de Fondos de Terceros y Carteras Individuales, su Reglamento dictado mediante D. S. de Hacienda N° 129 de 2014 y las instrucciones obligatorias impartidas por la Comisión para el Mercado Financiero (CMF).

5. MBI AGF fue constituida por escritura pública de fecha 13 de octubre de 2003, ante el Notario Público don Humberto Santelices Narducci. Un extracto de dicha constitución se publicó en el Diario Oficial de fecha 17 de diciembre de 2003, y se inscribió en el Registro de Comercio del Conservador de Bienes Raíces de Santiago a fojas 37.999, número 28.807 del mismo año. Con fecha 11 de diciembre de 2003, mediante Resolución Exenta N° 462, la Comisión para el Mercado Financiero autorizó la existencia y aprobó los estatutos de la sociedad.

6. Hago presente que el capital de MBI AGF SA -en parte- se encuentra invertido en cuotas de los fondos de inversión MBI Deuda Total (CFIMBIDT) y MBI Deuda Privada (CFIMBDPA).

7. Conforme a los estatutos y la autorización de existencia de la Comisión para el Mercado

Financiero, MBI AGF SA administra, entre otros, los siguientes fondos de inversión públicos: (i) MBI Deuda Plus Fondo de Inversión, (ii) MBI Deuda Total Fondo de Inversión, (iii) MBI Renta Fija Plus Dólar Fondo de Inversión, (iv) MBI Deuda Latam Fondo de Inversión, (v) MBI Deuda Privada Fondo de Inversión y (vi) MBI Rendimiento Total Fondo de Inversión.

8. MBI Deuda Total Fondo de Inversión invierte como mínimo un 95% de sus activos en instrumentos de renta fija local, o fondos que tengan como objeto principal invertir en instrumentos de renta fija nacional. Las cuotas se transan en la Bolsa de Comercio de Santiago y sus cuotas tienen presencia bursátil. El Benchmark del fondo es RiskAmerica Corporativo 2Y.

9. MBI Deuda Plus Fondo de Inversión busca generar retornos absolutos en el largo plazo, invirtiendo mayoritariamente en instrumentos de renta fija que aseguren una baja volatilidad y adecuada predictibilidad de las rentabilidades del Fondo. Este fondo agrega valor -Plus- al invertir hasta un 15% de su patrimonio en instrumentos financieros como acciones, derivados locales e internacionales, basados en la visión de mercado sobre monedas, acciones y commodities del equipo de inversiones de MBI. El Fondo busca generar retornos anuales en un nivel consistente con la Tasa de Política Monetaria del Banco Central de Chile (TPM) más 4% anual. Los activos del Fondo están custodiados en el DCV y sus transacciones están sustentadas por sistemas contratados a la Bolsa de Comercio de Santiago.

10. MBI Deuda Privada Fondo de Inversión invierte mayoritariamente en instrumentos y títulos de deuda emitidos principalmente por sociedades chilenas y respaldados con activos, así como en cuotas de fondos de inversión, tanto nacionales como internacionales.

11. MBI Deuda Latam Fondo de Inversión está orientado a constituir un portafolio de inversión basado en instrumentos de deuda, emitidos en USD, por entidades domiciliadas en países de América Latina, Centroamérica y El Caribe, o que en dicha zona geográfica se ubique la mayor parte de sus activos, sus ventas o de las actividades que constituyen la principal fuente de sus negocios. El Fondo busca mantener un alto nivel de indexación con respecto al índice de bonos JP Morgan CEMBI Latam Broad Diversified.

12. MBI Renta Fija Plus Dólar Fondo de Inversión invierte mayoritariamente en  instrumentos de renta fija que aseguren una volatilidad relativamente baja y una   adecuada predictibilidad de las rentabilidades del Fondo. Este fondo agrega valor -Plus al invertir hasta un 15% de su patrimonio en instrumentos financieros como acciones,   derivados locales e internacionales, basados en la visión de mercado sobre monedas,   acciones y commodities del equipo de inversiones de MBI. El Fondo busca generar retornos anuales en un nivel consistente con la Tasa de Política Monetaria de la Reserva  Federal de EEUU (Fed Fund) más 3% anual expresado en dólares. Los activos del Fondo están custodiados en el DCV y sus transacciones están sustentadas por sistemas  contratados a la Bolsa de Comercio de Santiago.

13. MBI Rendimiento Total Fondo de Inversión (es absorbido por MBI DEUDA PLUS FONDO DE INVERSION en Septiembre de 2022)

**Grupo CGB y Filiales.**

14. CorpBanca es una institución financiera que remonta su historia a 1871, año en que  inició su operación con el nombre de Banco de Concepción. Durante su trayectoria el  Banco ha sido controlado por diversas instituciones y personas, entre ellos CORFO y  SONAMI. En 1995 un grupo de inversionistas, liderados por el querellado, a través de  la compañía INFISA (actualmente Grupo CGB y Filiales) toma el control de la  propiedad del Banco.

15. El grupo controlador al año 2020 poseía presencia –además de la industria bancaria- en  los negocios de retail, con empresas tales como SMU, OK Market y Construmart, entre  otros; en el negocio inmobiliario con malls y strip centers; y en el negocio de las comunicaciones con presencia en diarios de circulación nacional y radios.

16. El grupo "CGB y Filiales" está compuesto por su matriz - Corp Group Banking S. A.,  en adelante CGB-, una filial directa, de la que posee el 100%, la sociedad Inversiones CG Financial Chile Dos SpA (ICGF-Chile2) y, dos filiales indirectas, también controladas en un 100% a través de ésta, CG Financial Chile SpA (CGF-Chile) y CG Financial Colombia SAS (CGF-Colombia). En consecuencia, CGB matriz controla el 100% de sus tres filiales (sus "Filiales").

17. CGB es la sociedad de mayor tamaño dentro de CGB y Filiales: a septiembre de 2020 poseía individualmente el 93% de los activos contables consolidados de CGB y  Filiales.

## Figura 1: Relación entre CGB y sus Filiales



18. CGB y Filiales presentan EEFF consolidados que se indican fueron realizados en base a la normativa vigente en Chile (la cual es compatible con los estándares internacionales, IFRS). A septiembre de 2020 sus principales activos eran los siguientes:

| | Monto en millones de $ | % del Total de Activos |
|---|---|---|
| *Activos circulantes:* | | |
| Efectivo y equivalentes al efectivo | $ 7 | 0% |
| Cuentas por cobrar a Relacionadas | $ 1.756 | 0% |
| Otros activos circulantes | $ 0 | 0% |
| *Activos no circulantes:* | | |
| Inversiones en Coligadas (a) | $ 881.125 | 94% |
| Activos por impuestos diferidos | $ 51.151 | 5% |
| Otros activos no circulantes | $ 1 | 0% |
| **Total activos** | **$ 934.040** | **100%** |

| *(a) Las inversiones en Coligadas corresponden a acciones de las siguientes sociedades (en paréntesis la participación de CGB y Filiales en ellas):* | | *¿Cuánto está en CGB matriz y no en sus Filiales?* |
|---|---|---|
| SAGA (43,2%) | $ 136.571 | 15% | 15% |
| Itaú CorpBanca (26,6%) | $ 663.131 | 71% | 71% |
| Itaú CorpBanca Colombia (10,3%) | $ 61.532 | 7% | 1% |
| Fondo de Inversión Privado Corp Life (42,5%) | $ 19.891 | 2% | n/d |
| **Total Inversiones en coligadas** | **$ 881.125** | **94%** | |

Nota: La información se obtiene de los EEFF de CGB. Éstos entregan información principalmente consolidada entre ella y sus filiales, por lo que no es posible separar en cada ítem cuánto corresponde a activos de CGB y cuánto a cada una de sus filiales.

19. CGB y sus Filiales son sociedades de inversión, cuyo principal activo al año 2020 - correspondiente al 94% del total consolidado- son inversiones financieras y específicamente en acciones de sociedades que no controlan ("Coligadas"). Por tanto,

los flujos de ingresos de su negocio son principalmente dividendos provenientes de inversiones en sociedades coligadas. Dependiendo de la sociedad en cuestión, CGB y Filiales posee entre 10% y 43% de las acciones de las coligadas. La mayor de estas inversiones al año 2020 era en el Banco Itaú CorpBanca (en adelante ITCB), la cual ascendía al 26,6% del capital de dicho Banco y representa por si sola el 71% del total de activos consolidados de CGB y Filiales.

20. Un aspecto que cabe hacer notar relativo a los activos de CGB y Filiales es que mantienen prendadas una parte muy significativa de las acciones en las sociedades coligadas que forman parte de su patrimonio. Específicamente, $488.759 millones de los $663.131 millones invertidos en acciones de Itau CorpBanca están prendadas (esto es, un 74% de dichas acciones). Asimismo, CGB y su filial CGF-Colombia tienen prendados el 100% de los $61.532 millones que tiene invertidos en acciones del banco Itau CorpBanca Colombia. CGB y Filiales han dado estas prendas como garantía de créditos otorgados por terceros acreedores a sociedades relacionadas.

21. El principal pasivo exigible a CGB corresponde al BONO que colocó en el mercado internacional en 2013: $14.320.- millones correspondientes a INTERESES devengados y no pagados y $393.563.- millones correspondientes al CAPITAL del bono, lo que sumado representa un 83% del pasivo exigible total de $492.386.- millones. Todo esto de acuerdo a valores al 31.DIC.2021.

### Acerca de las sociedades relacionadas: "Compañía Inmobiliaria y de Inversiones SAGA SpA" e "Inversiones GASA Limitada".

22. La Compañía Inmobiliaria y de Inversiones SAGA SpA, en adelante indistintamente SAGA, Rut Nº 88.202.600-0, es una sociedad relacionada de CGB.

23. Respecto a las actividades empresariales de SAGA, es limitada la información que se puede extraer de los registros públicos: de su nombre se entiende que SAGA es una sociedad de inversiones; de los EEFF de CGB se conoce el total de su activo y patrimonio contables, así como su utilidad del ejercicio y la deuda que CGB tiene con ella; de los EEFF de ITCB se conocen sus inversiones en dicho Banco; y de los reportes de la SEC se observa que, al igual que CGB, ha garantizado parte de sus activos para caucionar obligaciones de sociedades relacionadas con terceros acreedores. Las acciones de SAGA -al menos en documentos públicos- no aparecen prendadas. No hay antecedentes respecto de la normativa aplicada en su contabilidad –por ejemplo, si se ciñe o no a IFRS- y no se

conoce si su balance es auditado o no.

24. Resulta importante destacar que en el EEFF al 31.DIC.2018 de ITAU Corpbanca y Filiales, pasa de tener el 4,0824 % al 2,0036 % de las acciones en el referido Banco, es decir una disminución del 50,92% de su posición accionaria. En el año 2019 se mantiene igual, señalándose que la compañía es parte de la "Familia Saieh". Posteriormente, en el año 2020 mediante hecho esencial – nuevas adquisiciones de Itaú Unibanco Holding S.A.- Itaú Unibanco Holding S.A. anunció que por intermedio de su filial ITB Holding Brasil Participações Ltda., adquirió de Compañía Inmobiliaria y de Inversiones Saga SpA (SAGA), la cantidad de 5.558.780.153.- de acciones de Itaú Corpbanca, por un monto total de compra de $33.138.103.833.- Como consecuencia de esta adquisición, Itaú Unibanco aumentó su participación accionaria en Itaú Corpbanca en un 1,08% aproximadamente. De este modo, al año 2020 SAGA quedó únicamente con un 0,92% de las acciones del Banco ITCB.

25. En el EEFF al 31.DIC.2021 nuevamente se refleja una disminución del número de acciones de SAGA en el referido Banco, ya que al término del ejercicio sólo le quedaba el 0,48% de las acciones.

26. Así y, en definitiva, para la correcta comprensión del delito que es materia de la presente querella, <u>la referida compañía SAGA fue disminuyendo progresivamente su participación en el Banco Itau Corpbanca: 2017 y 2018 un 4,0824%; año 2019 un 2,0036%; año 2020 un 0,92%; y, por último, año 2021 con un 0,48%.</u>

27. Por su parte la sociedad "Inversiones GASA Limitada", en adelante indistintamente GASA Rut N° 76.034.463-K, es una sociedad de inversiones e intermediación financiera, la cual es controlada por Corpgroup Holding Inversiones Ltda., R.U.T. N°96.953.290-5.

28. Fue constituida por escritura pública de fecha 31 de julio de 2008, otorgada ante el Notario Público señor José Musalem Saffie. El extracto respectivo está inscrito en el Registro de Comercio del Conservador de Bienes Raíces de Santiago del año 2008 a fojas 43.609, número 29.994 y se publicó en el Diario Oficial con fecha 20 de septiembre de 2008. La sociedad ha sufrido diferentes modificaciones siendo la última la que consta en escritura pública de fecha 29 de agosto de 2018, otorgada ante el Notario Público señor Iván Torrealba Acevedo, cuyo extracto se inscribió en el Registro de Comercio del Conservador de Bienes Raíces de Santiago del año 2018 a fojas 74.948, número 38.490 y se publicó en el Diario Oficial con fecha 8 de octubre de 2018.

**Emisión de Bono (Note) denominado CGB 13/23.**

29. Corp Group Banking S. A. emitió en mayo de 2013 un bono (ISIN USP31925AD54 y nombre Corp Grp Banking 13/23, en adelante CGB 13/23) por la suma de US$ 500.000.000.-, con un interés del 6,750% con vencimiento para el día 15 de marzo de 2023. Los intereses se pagarían en marzo y septiembre de cada año. Se estableció la posibilidad de rescatar los bonos con fecha 15 de marzo de 2018.

30. Fueron nombrados administradores del bono los bancos Deutsche Bank Securities y Goldman, Sachs & Co. En su momento, todos los documentos de la emisión fueron publicados en la página web de la Bolsa de Valores de Luxemburgo. Asimismo, se indicó que toda la información podía ser solicitada a CGB, con domicilio en Rosario Norte 660 piso 23, Las Condes, Santiago, mediante la atención de María Pilar Dañobeitía Estades.

31. Se señaló específicamente que el emisor del bono -CGB- es una sociedad anónima cerrada, organizada bajo las leyes de la República de Chile. Se agregó que todo los directores y ejecutivos principales residen en Chile.

32. Se establecieron una serie de obligaciones de prohibiciones o covenants negativos para el emisor y sus subsidiarias, entre ellos:

   a. Endeudamientos adicionales.

      i) Corp Group no realizará, directa o indirectamente, ni permitirá que alguna de sus subsidiarias, incurran en endeudamientos adicionales, salvo aquellos permitidos expresamente en el bono.

      ii) Se permiten sólo aquellos endeudamientos emitidos con la misma fecha del bono, o que se encontraban emitidos con anterioridad, o aquellos relacionados con el capital necesario para el negocio bancario, entre otros.

   b. Realizar ciertos pagos.

      i) Corp Group no realizará, ni permitirá que sus subsidiarias realicen, directa o indirectamente, pagos de cualquier dividendo o realizar cualquier distribución con respecto a las Acciones del Capital Social de Corp Group o de cualquiera de sus subsidiarias a los titulares de dicho Capital Social, con excepción:

         (i) Los dividendos o distribuciones pagables en Acciones de Capital Calificadas de Corp Group;

         (ii) Los dividendos o distribuciones pagables a CorpGroup; o

(iii) Los dividendos o distribuciones a todos los titulares de Acciones de Capital de una Subsidiaria Restringida, en base a un calculo a prorrata o mayor a este.

ii) Comprar o adquirir de cualquier modo o retirar valor de cualquier Acción de Capital de Corp Group o de sus relacionadas;

iii) Realizar cualquier pago de capital, comprar, cancelar, rescatar, pagar anticipadamente, disminuir o de otro modo adquirir o retirar por valor, antes de cualquier vencimiento final programado, reembolso programado o pago programado de fondo de amortización, según sea el caso, cualquier deuda subordinada; o incurrir en deuda adicional; realizar ciertos pagos restringidos; crear gravámenes; y realizar transacciones con partes relacionadas.

c. Restricciones sobre distribución de dividendos de CorpBanca: Corp Group votara en representación de las acciones en que es titular de CorpBanca en la medida que lo permitan las leyes chilenas de Sociedades Anónimas, a favor del pago por parte de CorpBanca de dividendos anuales a sus accionistas por un monto anual equivalente al menos al 30% de la unidad neta de CorpBanca de cada ejercicio.

d. Limitaciones sobre nuevos gravámenes: Ni Corp Group ni cualquiera de sus relacionadas, podrá gravar, ni permitirá que se constituya ningún gravamen sobre la totalidad o parte de sus bienes, ya sean dueños de estos al momento de emitir los bonos, o que hayan sido adquiridos con posterioridad a este. Tampoco pueden gravar los intereses, rentas o beneficios que sean derivados de estos bienes, para garantizar una deuda presente o futura de Corp Group o de sus Subsidiarias, sin que se establezca efectiva y claramente que los bonos están garantizados con anterioridad a dicha deuda o de forma igual o proporcional a la misma.

e. Limitación de las Operaciones (transacciones) con sociedades controladas (Affiliates).

i) Corp Group no podrá celebrar, ni permitirá que las Subsidiarias Restringidas celebren, directa o indirectamente, ninguna Operación / Transacción o serie de operaciones relacionadas (incluyendo, sin limitación, la compra, venta, arrendamiento o intercambio de cualquier bien o la prestación de cualquier servicio) con, o en beneficio de, cualquiera de los Afiliados de Corp Group, a menos que:

(i) Los términos de dicha transacción sean más favorables para Corp Group que para aquellos que podría esperarse obtener en una transacción, comparable en ese momento, en condiciones de libre competencia, de una persona que no

sea relacionada;

(ii) En el caso de que dicha transacción implique pagos anuales agregados, o transferencias de bienes o servicios con un Valor Justo de Mercado superior a US$10,0 millones, los términos de la tendrán que ser aprobados por la mayoría de los miembros del Directorio de Corp Group; y

(iii) En el caso de que dicha transacción implique pagos anuales agregados, o transferencias de bienes o servicios con un Valor Justo de Mercado superior a US$20,0 millones, deberá un asesor financiero independiente, dar una opinión favorable en cuanto a la equidad de dicha transacción para llevarla a cabo.

f. Venta de valores: Corp Group no realizará, y no permitirá que sus relacionadas realicen, venta de valores, a menos que reciban al momento de la transacción un Valor Justo de Mercado.

**Inversiones en el Bono CGB 13/23.**

33. Los fondos de inversión (i) MBI Deuda Plus Fondo de Inversión, (ii) MBI Deuda Total Fondo de Inversión, (iii) MBI Plus Dólar Fondo de Inversión, (iv) MBI Deuda Latam Fondo de Inversión, (v) MBI Deuda Privada Fondo de Inversión y (vi) MBI Rendimiento Total Fondo de Inversión invirtieron en el bono referido más arriba.

34. De acuerdo a los certificados del DCV las posiciones del querellante a Noviembre del 2020 eran las siguientes:

(i) Certificado de posición N° 350892, correspondiente a cuenta 76038031, en código de instrumento USP31925AD54, con una posición nominal disponible de US$ 30.566.000,0000.

(ii) Certificado de posición N° 350894, correspondiente a cuenta 76038040, en código de instrumento USP31925AD54, con una posición nominal disponible de US$ 895.000,0000.

(iii) Certificado de posición N°350890, correspondiente a cuenta 76038023, en código de instrumento USP31925AD54, con una posición nominal disponible de US$ 2.100.000,0000.

(iv) Certificado de posición N°399, correspondiente a cuenta 72652274, en código de instrumento USP31925AD54, con posición nominal disponible de US$ 5.840.000,0000.

(v) Certificado de posición N°350898, correspondiente a cuenta 76038090, en código de instrumento USP31925AD54, con posición nominal disponible de US$ 2.730.000,0000.

(vi) Certificado de posición N°350897, correspondiente a cuenta 76038066, en código de instrumento USP31925AD54, con posición nominal disponible de US$ 6.830.000,0000.

35. De acuerdo a certificado al día 03.NOV.-2020 emitido por Brown Brothers Harriman, correspondiente a cuenta 3550100 y ID B824K72, el fondo MBI Deuda Latam FDI, tiene una posición nominal de US$3.080.000.-

36. Adicionalmente debe señalarse que MBI CORREDORES DE BOLSA S.A., también querellante, invirtió directamente en el bono referido más arriba. A Noviembre de 2020, mantenía una posición nominal de US$ 1.000.000, de acuerdo a Portfolio Number: 30221 emitido por BTG Pactual Cayman

37. En definitiva, las inversiones nominales totales de mis representadas en el Bono "CGB 13/23" ascienden a la suma de US$ 53.041.000.-.

## HECHOS CONSTITUTIVOS DE DELITO.

38. Entre los años 2016 y 2020 el querellado dispuso que CGB ejecutara con sus relacionadas SAGA y GASA una serie de contratos de suscripción y compraventa de acciones de SAGA, todos los cuales son simulados, ya que la real voluntad del controlador fue sacar activos de CGB y en ningún caso adquirir las referidas acciones. La forma en que implementó este vaciamiento de activos, tenía la razón de ser de no vulnerar las prohibiciones u obligaciones de no hacer consagradas en las bases del bono por una parte, y por otra, dejar a CBG sin activos, y poder, en definitiva, sujetar a un proceso concursal al emisor del bono, pero sin activos. Tanto así el plan delictual, que los recursos ya radicados en la sociedad SAGA, fueron dispuestos por el querellado en su beneficio o de alguna de las sociedades de su familia. Se trató de la celebración de una serie de contratos de traspasos de acciones por un monto total aproximado a los $164.735.000.000.-. Significó un vaciamiento del patrimonio de CGB realizado en perjuicio de los bonistas. Es decir, de los acreedores del Bono CGB 13/23. En conclusión, el emisor del bono fue despojándose de todo su activo.

39. A efectos de comprender a cabalidad lo anterior, es necesario hacer presente la relación

societaria existente entre CGB, SAGA y GASA; todas son sociedades que forman parte de un conglomerado que depende de un mismo controlador, Corpgroup Inversiones Limitada y, en definitiva, del querellado Álvaro Saieh Bendeck.

40. Entre los años 2016 y 2020, CGB realizó una serie de transacciones sobre acciones de su relacionada SAGA, cuyos montos sumados ($164.735.- millones), a septiembre de 2020, ascendían a un 37% del patrimonio contable de ésta. Mediante dichas transacciones, CGB aumentó su participación en Saga, de un 0%, en el año 2016, a un 43%, en el mes de septiembre de 2020, adquiriendo acciones de dicha sociedad por el monto señalado.



**Gráfico 1: Crecimiento de la participación de CGB en SAGA**
(% de las acciones de SAGA en manos de CGB)

41. En específico, <u>CGB realizó una serie de compras y suscripción de acciones de SAGA,</u> conforme al siguiente detalle:

| FECHA | OPERACIÓN | CONTRAPARTE | NUEVAS | NRO. ACCIONES | MONTO ($MILLONES) | PRECIO POR ACCIÓN |
|---|---|---|---|---|---|---|
| JULIO 2020 | Compra | GASA | NO | 1.433.295.569 | $2.560 | $1,79 |
| JUNIO 2020 | Compra | GASA | NO | 2.709.548.695 | $4.767 | $1,76 |

| | | | | | | |
|---|---|---|---|---|---|---|
| MARZO y ABRIL 2020 | Compra | GASA | NO | 19.215.669.632 | $33.663 | $1,75 |
| 1 ABRIL 2019 | Compra | SAGA | SI | 1.005.064.520 | $2.000 | $1,99 |
| 14 SEP 2018 | Compra | GASA | NO | 5.224.480.449 | | N/D |
| 13 ABRIL 2018 | Compra | SAGA | SI | 4.076.860.267 | $8.963 | $2,20 |
| FEB 2018 | | SAGA | | 1.991.393.169 | $4.378 | $2,20 |
| Detalle: | | | | | | |
| 26.02.18 | Suscripción | SAGA | SI | 429733007 | | |
| 15.02.18 | Suscripción | SAGA | SI | 461392901 | | |
| 19.02.18 | Suscripción | SAGA | SI | 472169191 | | |
| 13.02.18 | Suscripción | SAGA | SI | 628098004 | | |
| 4T 2016 | Compra | SAGA | SI | 16.442.162.746 | $40.598 | $2,47 |
| 3T 2016 | Compra | SAGA | SI | 7.511.112.973 | $18.988 | $2,53 |
| 2T 2016 | Compra | SAGA | SI | 19.103.786.935 | $48.818 | $2,56 |
| **TOTAL PESOS** | | | | | **$164.735** | |

48. Como resultado de dichas transacciones, CGB se despojó prácticamente de todo su activo, sufriendo un daño patrimonial derivado de la adquisición de acciones a un precio de compra superior al valor económico que dicha inversión representa para ésta.

49. Cabe hacer presente -como ya lo hemos referido- que GASA es una sociedad controlada por CGB.

50. Asimismo, y en relación al precio de mercado de las acciones de SAGA, el activo contable del patrimonio de esta sociedad lo contabilizaron a un valor superior a su valor económico real (activo valorizado contablemente por sobre su valor económico), lo cual se traduce en un valor libro de la acción mayor que su precio de mercado (valor libro corresponde al valor de su patrimonio contable dividido por el total de sus acciones suscritas y pagadas).

51. Dicha afirmación estará sustentada en lo siguiente:

   a. Las acciones de Itaú Corpbanca (ITCB) en poder de SAGA están valorizadas en su contabilidad por sobre su cotización bursátil;

   b. El valor contable de las acciones de SAGA no incorporaría la disminución de valor de las acciones de ITCB prendadas para garantizar obligaciones ajenas; c. Los estados financieros de CGB arrojan que más de la mitad del activo de SAGA estaba compuesto por otros activos no identificados (que, presumiblemente incluirían acciones o participaciones en sociedades relacionadas, respecto de las cuales cabría aplicar las mismas consideraciones relativas a la diferencia entre el precio de mercado y valor contable de estas);

   d. SAGA había otorgado fianzas y constituido deudas solidarias para garantizar obligaciones de relacionadas (circunstancia que aumenta el pasivo de dicha sociedad y que no estaría considerada en el valor contable de su patrimonio);

   e. El valor contable de las acciones de SAGA no contemplaría el descuento que corresponde hacer al precio de mercado de acciones que no otorgan el control sobre la compañía; y

   f. En el valor contable de las acciones tampoco se incorporaría la existencia de pactos de accionistas que restrinjan el uso de las mismas.

52. Por tanto, las compras de acciones de SAGA- fueron derechamente perjudiciales para CGB. Esta última se encontraba ciertamente en una situación de estrechez financiera, que fue empeorando con el transcurso del tiempo. Tanto así, que CGB fue bajado en la clasificación de riesgo crediticio (un reconocido indicador de estrechez financiera), al tiempo en que fue incrementando progresivamente su participación en la relacionada SAGA. En efecto, entre fines del año 2016 y mediados del 2020 la clasificación de CGB bajo desde la categoría B a CCC.

**Subsunción de la conducta concreta.**

53. Atendidos los antecedentes expuestos más arriba, no cabe sino concluir la reiteración de operaciones simuladas, las cuales se subsumen el delito de contrato simulado a la luz de los hechos descritos. Así, de acuerdo a los antecedentes conocidos, CGB, entre los años 2016 y 2020, realizó una serie de transacciones sobre acciones de su relacionada SAGA, cuyos montos sumados (al mes de septiembre de 2020) ascendían a la cantidad de $164.734 millones, equivalentes a un 37% del patrimonio contable de ésta. En este transcurso de tiempo, CGB aumentó su participación en SAGA, de un 0%, en el año 2016, a un 43%, en septiembre del año 2020.

54. Las transacciones aludidas consistieron en compraventas de acciones entre CGB y SAGA, por una parte, y entre CGB y GASA u otra relacionada, por la otra, en virtud de las cuales CGB adquirió acciones de SAGA a un precio determinado. Al respecto, cabe hacer referencia a que la compraventa es un acto jurídico bilateral, creador de obligaciones, que cabe perfectamente en la voz "contrato" utilizada por el legislador en el artículo 471 N°2 del CP.

55. En cuanto a la conducta sancionada por el delito, el legislador exige que se otorgue el contrato, para lo cual -conforme se ha entendido mayoritariamente- bastaría que se suscriba cumpliéndose las formalidades propias del acto de que se trate. En este caso, se llevaron a efecto compraventas de acciones de primera emisión (transacciones realizadas hasta el año 2019) y ya existentes (transacciones efectuadas en el año 2020), en las cuales, según la información conocida, se habrían observado las formalidades exigidas por ley.

56. En lo relativo a la concurrencia del instituto de la simulación en los hechos revisados, cabe recordar que esta última existe en la medida en que la voluntad declarada en el negocio simulado difiera de la real intención de quienes concurren al acto. En este sentido, sin perjuicio de la formulación clásica que comprende las hipótesis de simulación absoluta y relativa, con supuestos claros sobre los cuales debería versar la apariencia del acto (personas, términos, naturaleza y existencia del acto), para efectos de estimar configurado el delito previsto en el 471 N°2 a la luz de los antecedentes -ello, en el entendido que en este grupo de casos estaríamos en presencia de transacciones efectivamente realizadas-, y siguiendo a la doctrina en el sentido y alcance atribuido al concepto de simulación, la diferencia entre la voluntad real y declarada se produce en el ámbito intencional de quienes concurrieron al otorgamiento del acto. Existe simulación relativa cuando se presenta una divergencia entre lo que se manifiesta por las partes como normas de regulación de sus intereses contrapuestos, y la verdadera forma o modo en que

efectivamente acuerdan como normas para dicha

relación. Así, desde este punto de vista, y apelando a la finalidad práctica que en el tráfico jurídico se asocia a un contrato como la compraventa, es posible evidenciar una discordancia palmaria entre la manifestación de los otorgantes -que está implícita en este tipo de contratos- y la real intención de los mismos a la hora de suscribir dichos actos.

57. La compraventa es un título esencialmente oneroso, en el marco de la cual los contratantes buscan una utilidad o beneficio recíproco. En este sentido y- como ya referimos anteriormente-, si atendemos a la asimilación que hace el Código Civil de los conceptos "título lucrativo" y "título oneroso" en distintos preceptos, y, desde ese punto de vista, dotamos de contenido al concepto de onerosidad de cara a contratos como la compraventa, podemos afirmar que la adquisición de acciones ilíquidas por parte de CGB, como las de su relacionada SAGA -circunstancia conocida por aquella y por GASA al momento de realizar las transacciones- a un precio superior al de mercado (pues su activo contable estaría contabilizado a un valor superior a su valor económico), en un contexto de estrechez financiera, deja en absoluta evidencia que la única intención que subyacía a dichas transacciones era la de vaciar patrimonialmente a CGB de activos líquidos -y, como contrapartida, beneficiar a sus relacionadas del conglomerado- generando como consecuencia final, disminuir de sideralmente de valor a CGB, en perjuicio de terceros, en este caso, los querellantes.

58. Que las compras de acciones ilíquidas de una sociedad relacionada, a un precio superior al de mercado, se hayan efectuado en los términos ya aludidos, se puede concluir que la verdadera intención que subyacía a las operaciones realizadas era la de perjudicar a quienes se hallaban en una relación jurídica con el sujeto pasivo del hecho (los acreedores del contrato de bono), poniéndose en la imposibilidad real de cumplir las obligaciones contraídas a su respecto -y, con ello, beneficiar a las sociedades relacionadas con el dinero desviada hacia ellas. En otras palabras, de los términos en que los contratos de compraventa fueron suscritos, queda de manifiesto que la intención de CGB, a pesar de tratarse de un título esencialmente oneroso, era sacar sus activos, a una empresa relacionada, a cambio de acciones de esta última sociedad, la cual casi no tienen valor alguno, para, en definitiva, desde SAGA, desviar dichos activos a personas naturales y jurídicas relacionadas al querellado.

59. Debemos recordar que -de manera paralela al aumento de participación en SAGA del 0% al 43%- al mismo tiempo el querellado dispuso que SAGA se desprendiera de las acciones en el Banco ITCB, pasando de detentar el 4,0824% en el año 2018 al 0,48% en el año 2021.

60. Continuando con el análisis de subsunción, y en aras de afirmar la aplicabilidad del instituto de la simulación a los hechos analizados, es posible sustentar asimismo la divergencia de la voluntad declarada y la real en uno de los elementos/requisito de validez del acto jurídico: la causa lícita. Como ya señalamos, la causa motivo o móvil de los contratantes no consiste en un elemento ajeno al derecho, sino que, muy por el contrario (y así lo ha sostenido la mayoría de nuestra doctrina), constituye en la medida en torno al cual se verifica si un acto jurídico tiene o no causa lícita. En este sentido, las distintas transacciones, realizadas en un período espaciado de tiempo -entre el segundo semestre del 2016 y julio de 2020- dan cuenta que la voluntad manifestada de los contratantes era precisamente la de aparentar la suscripción de actos con causa lícita, en circunstancias que el único móvil subyacente a los mismos era vaciar de valor la compañía, generando a consecuencia un perjuicio a los terceros, y apropiarse, en definitiva, de dichos activos.

61. Por su parte, en cuanto a la exigencia típica de perjuicio irrogado a terceros, al tenor de rol resuelto por nuestra Corte Suprema, las distintas transacciones realizadas entre CGB y sus relacionadas provocaron un perjuicio patrimonial respecto de los tenedores de los bonos colocados. En efecto, la afectación del derecho de prenda general de los acreedores es constitutiva de perjuicio a la luz del artículo 471 N°2 del Código Penal, la imposibilidad de satisfacción de las acreencias pertenecientes a los bonistas es plenamente subsumible en esta hipótesis de lesión. Máxime si se considera que CGB, a partir del año 2020, dejó de pagar los intereses bianuales comprometidos, y que el bono colocado dejó de tener el respaldo financiero en su emisor, al haberse despojado de sus activos mediante una serie de actos simulados.

**Perjuicio para los inversionistas.**

62. En este sentido, y de cara a los elementos del tipo en cuestión, la producción del perjuicio -que pasa precisamente por el vaciamiento patrimonial que irrevocablemente impidió hacer efectiva la obligación asumida por CGB-, tiene como antecedente precisamente las transacciones efectuadas por CGB (puesto que sus montos sumados comprometieron alrededor de un 40% de su patrimonio contable) que tuvieron por finalidad trasladar los activos de la compañía a sus relacionadas, en perjuicio de terceros (vaciamiento patrimonial).

63. Sin perjuicio que será la investigación del Ministerio Público la que deberá determinar con total precisión el monto del perjuicio, debemos hacer presente que al menos alcanza a la

suma de USD$ 50.855.711.-, equivalente al día 16.ENE.2023 a la suma de $ 41.921.888.249.- (de acuerdo a dólar observado de ese día).

64. En efecto, debemos tener presente que el querellado incluyó -dentro del plan criminal acogerse al Capítulo 11 del Código de Quiebras de Estados Unidos, tanto respecto de CGB y SAGA, todo ello ante la Corte de Quiebras del Distrito de Delaware, Estados Unidos. El caso se individualizó como "Case N° 21-10969-JKS". Dicho acuerdo se dispuso en la Junta de Accionistas de SAGA llevada a cabo en Santiago el día 28 de junio de 2021. Compareció a dicha Junta el señor Jorge Andrés Saieh Guzmán, hijo del querellado. Respecto de CGB, el acuerdo se tomó en Sesión Extraordinaria de Directorio de fecha 24.JUN.2021, en la cual concurrieron los directores Jorge Andrés Saieh Guzmán, María Catalina Saieh Guzmán y Roberto Guerrero del Río.

65. Así, el referido plan criminal, partió en el año 2016 con la ejecución de los contratos simulados, todo ello de manera consistente hasta el año 2020, vaciando patrimonialmente a CGB, para luego invocar la insolvencia del deudor y solicitar un proceso de reorganización ante un Tribunal Extranjero en el año 2021. No se pagaron los intereses del bono de los años 2021 y 2022, acogiéndose a dicho procedimiento (Capitulo XI) en el cual reconoció que sólo dispone de recursos para pagar el 4,12% del capital del bono. Se trata de un complejo plan delictual, ejecutado fríamente en el tiempo, con la colaboración de diversas personas, algunas de ellos familiares directos del querellado.

66. No se trata de una situación accidental o el riesgo propio de un negocio, sino que es un caso propio de criminalidad económica o de cuello y corbata. El querellado desde este punto de vista utilizó lo instrumentos de la vida económica moderna -bonos- para captar el interés, dinero de los inversionistas, para luego comenzar a ejecutar reiteradamente actos de vaciamiento patrimonial, todo ello en perjuicio de terceros, querellantes de autos

### Autoría punible.

67. En cuanto al sujeto activo del delito en comento, es posible afirmar que la formulación y estructura del ilícito nos señala que cualquier persona pude ser autor del mismo; no debe exhibir características particulares que permita erigirlo en calidad de tal.

68. En este orden de ideas, y teniendo en consideración que el contrato simulado exige un

acuerdo entre los contratantes del acto otorgado en perjuicio de terceros, quienes concurrieron a su celebración se considerará coautores del delito previsto en el artículo 471 N°2 del Código Penal.

69. Al querellado le ha cabido participación en calidad de autor del art. 15 N° 1 del Código Penal.

### Figura 2: Relación entre CGB, SAGA y GASA
(Las flechas indican qué sociedad controla a la otra)



70. El querellado es el controlador del Grupo CGB y Filiales. De acuerdo al art. 97 de la Ley de Mercado de Valores es quien directamente o a través de otras personas naturales o jurídicas, participa en la propiedad y tiene el poder de realizar algunas de las conductas que señala la norma y, es especial, influir decisivamente en la administración de las sociedades CGB y SAGA.

71. La información sobre las relaciones de control entre las sociedades se obtiene de los datos presentados por el querellado a la SEC en las siguientes fechas:

1. Del 27 de noviembre de 2020, donde indica: "Interhold es el accionista mayoritario de CGB. CGHIL es el accionista mayoritario de Interhold. CGF es la persona quien controla (dueño de) CGHIL. Gasa es el accionista mayoritario de Saga. CGI es el accionista mayoritario de CGF y Gasa. CGHIL es el accionista mayoritario de CGI. Don Saieh Bendeck es el fundador del grupo Corp y se podría considerar como la persona que controla CGHI y CGF."; y

2. Reporte de fecha 1 de abril de 2016, en que indica una estructura de control casi idéntica

a la ilustrada en la figura y especifican que GASA es la única accionista de SAGA en dicho momento. Específicamente, en este caso se indica que: "Interhold es el accionista mayoritario de CGB. CGHIL es el accionista de Interhold. CGF es la persona controladora (dueño) de CGHIL. Gasa es el único accionista de Saga. CGI es el accionista mayoritario de CGF y Gasa. CGHI es el accionista mayoritario de CGI. Don Saieh Bendeck es presidente del directorio y quien controla CGHI, y es director de CGF. El resto de los denunciantes están en el negocio de inversiones y valores."

72. En la misma emisión del bono se señaló lo siguiente: "Nuestros accionistas mayoritarios, encabezados por don <u>Álvaro Saieh Bendeck</u>, tienen más de 20 años de experiencia en la industria financiera en Chile. El Sr. Saieh, quien, junto con otros miembros de su familia, controla aproximadamente un 59.4% de las acciones ordinarias en circulación de CorpBanca (incluyendo las acciones que nosotros poseemos), posee acciones ordinarias con suficiente poder bajo la ley chilena, para aprobar sustancialmente todas las acciones corporativas de CorpBanca sujetas a la aprobación de accionistas, incluyendo la distribución de dividendos, y para elegir la mayoría de los 9 miembros integrantes del directorio. Una vez que se complete la oferta pendiente de derechos preferentes de CorpBanca, esperamos que las participaciones del Sr. Saieh y su familia en CorpBanca se diluya (o reduzca) a aproximadamente un 53.0% (asumiendo la suscripción de todos los derechos ofrecidos)."

73. No es menor un punto sobre la participación de los diversos ejecutivos -principalmente directores y gerentes generales- diversos del querellado. La investigación del Ministerio Público deberá determinar quiénes concurrieron con su voluntad a aprobar los diversos actos o contratos simulados que se han referido.

74. La doctrina establece que no existe problema alguno en determinar la responsabilidad penal frente a actuaciones de cuerpos colegiados. Ya no se trata de una causación o ejecución del delito mismo -por ejemplo, quien suscribió el contrato simulado o quien lo redactó- sino determinar quién es el *sujeto competente* por el hecho penalmente relevante. Así, la competencia jurídico penal por el hecho puede ser de una sola persona o de varias personas, ya sea vertical u horizontal. Todos los que actúan en un contexto objetivamente delictivo son los sujetos *competentes* por el delito, siendo el autor de acuerdo al *principio de competencia* quien tiene los deberes concretos y ello da lugar a su responsabilidad penal.

75. No hay dudas que el controlador del grupo económico tiene una función relevante, con independencia de su cercanía con el acto. En definitiva, el querellado perfectamente puede no haber participado de las sesiones de directorio, así como tampoco suscrito alguno de los contratos, pero no por ello deja de tener la competencia preferente por el hecho. Quien se encuentra en la cúspide, quien tiene un mayor grado de deberes, quien tiene el deber de evitar la comisión de delitos por parte de CGB y sus Filiales, es su controlador, quien es penalmente responsable por las competencias que detenta por su cargo. Como la palabra misma lo denota- *controlador*- se encuentra en el querellado la plenitud del *dominio de la organización*.

76. Reitero, será materia de la investigación del Ministerio Público determinar quiénes fueron los subordinados que participaron en los hechos, sean ellos familiares o no, los que materialmente llevaron a cabo las diversas conductas delictivas. Asimismo, de qué modo y en qué circunstancias el propio controlador intervino en las conductas delictivas de los subordinados.

## II.- <u>ACERCA DEL DERECHO.</u>

### Delito de otorgamiento de contrato simulado.

77. Los hechos precedentemente descritos constituyen delitos reiterados de otorgamiento de contrato simulado, previsto y sancionado en el artículo 471 N° 2 del Código Penal. La citada norma sanciona con la pena de presidio o relegación menores en sus grados mínimos o multa de 11 a 20 unidades tributarias mensuales a: "*El que otorgare en perjuicio de otro un contrato simulado*".

78. La conducta penal no consiste en aparentar la celebración de un acto jurídico, sino que realmente otorgar uno, pero cuyo contenido no revela la verdadera voluntad de los intervinientes, que no han pensado ni han querido realizar el hecho o acuerdo que en él se describe. En este sentido, estaremos en presencia de un contrato simulado en la medida en que exista disconformidad, por un lado, entre la voluntad declarada y manifestada por los contratantes, y, por el otro, la voluntad real de quienes concurren al acto.

79. En dicho tenor, Etcheberry entiende que contrato simulado es "aquel que contiene una declaración de voluntad no real, hecha en forma consciente y de acuerdo entre los contratantes, para producir la apariencia de un acto jurídico que no existe o es distinto del que realmente se ha llevado a cabo".

80. Según lo dicho, el concepto de negocio simulado en su formulación clásica comprende dos hipótesis generales; aquella que consiste en la celebración de un contrato que en realidad no existe; y aquella que dice relación con un acto que es distinto a aquel realmente celebrado. En este orden de ideas, Francisco Ferrara lo define como "el que tiene una apariencia contraria a la realidad o porque no existe en absoluto o porque es distinto de cómo aparece". En esos términos, habrá simulación absoluta "si las partes acuerdan celebrar sólo una apariencia de acto que en realidad no quieren y que, en consecuencia, no tendrá existencia jurídica entre ellas, o relativa, si deciden celebrar un acto o negocio cuya apariencia sólo es falsa en cuanto a su naturaleza, a sus términos o contenidos, o a las personas que intervienen".

81. El tipo de este delito exige simplemente que se otorgue, es decir, que se establezca o estipule, un contrato simulado, y que con ello se cause un perjuicio a otra persona, perjuicio que ha de ser de índole patrimonial. Por ende, se ha de fingir un contrato y con ello producir un perjuicio patrimonial.

82. Que la simulación sea absoluta o relativa resulta indiferente (Rivacoba y Rivacoba, Quintano Ripollés y Bustos Ramírez). Es igual en uno y otro caso, pues la ley sólo exige que se trate de un contrato simulado; y, si causa perjuicio, se tiene la adecuación al tipo.

83. Para efectos de estimarse configurado el delito previsto en el 471 N°2 a la luz de los antecedentes -ello, en el entendido que las compraventas de acciones tratan de transacciones efectivamente realizadas-, la tipicidad se funda en la discordancia entre la voluntad real y declarada en la esfera intencional de quienes concurrieron a la celebración del acto. En dicho escenario, estaremos frente a un acto simulado cuando las partes de un negocio bilateral, de sus relaciones. No se trata que una parte quisiera pasar a dueño de las acciones, sino que simplemente se dispone de la suma de dinero que se indica como precio de ellas. No es el pago de un bien, sino que derechamente el modo de trasladar la riqueza desde un titular a otro.

84. En un sentido similar, existe en este caso una discordancia entre la voluntad declarada y la real desde la óptica de uno de los requisitos del acto jurídico: la causa lícita. En efecto, la simulación relativa también podría versar sobre este elemento del acto jurídico; el que, si bien dice relación con el móvil de los contratantes, no podemos olvidar que constituye a su vez la medida con el cual se determina si un acto tiene o no causa lícita. Un acto que aparenta tener causa lícita, en circunstancias que la verdadera intención que subyace al mismo no es otra que la de burlar el derecho de terceros, es constitutivo de un acto

simulado a la luz del artículo 471 N°2 del Código Penal.

85. Los delitos de otorgamiento de contrato simulado se encuentran en grado de consumados. Conforme señala la doctrina nacional, la conducta sancionada es otorgar el contrato, y para ello es suficiente que los contratantes lo extiendan y suscriban; entendiéndose que así sucede cuando cumple con las formalidades inherentes a la naturaleza del pacto aparentemente celebrado. Al respecto, es preciso señalar que, si bien por la voz "contrato" debemos entender, al tenor de las nociones presentes en el derecho civil, un acto jurídico bilateral destinado a la creación de derechos personales u obligaciones, el legislador penal no define concretamente el efecto que ha de tener el acto jurídico de cuya simulación se trata, por lo que podrían incluirse en dicho objeto material las convenciones que en general sean celebradas en perjuicio de terceros (actos jurídicos bilaterales que tienen por objeto la modificación, creación o extinción derechos u obligaciones). Ello resulta de toda lógica si consideramos que lo relevante del tipo penal en análisis es precisamente el perjuicio irrogado con ocasión del otorgamiento del acto de que se trate.

86. Adicionalmente, el tipo en comento señala que con el otorgamiento del acto mendaz se debe generar perjuicio para otro. De acuerdo a la doctrina mayoritaria, la formulación del delito de contrato simulado como una forma de estafa (como estafa impropia -pues no todos los elementos de la estafa estarían presentes en este delito- o fraude por engaño) exige la consideración del elemento perjuicio como parte del tipo penal en comento; la consumación del hecho depende de la irrogación de perjuicio a un tercero. Bajo esta perspectiva, el otorgamiento de contrato simulado en perjuicio de otro se erige como un delito que atenta contra el patrimonio, constituyendo la simulación una mera modalidad comisiva de la afectación patrimonial exigida. Al respecto se han pronunciado ETCHEBERRY y GARRIDO MONTT, quienes afirmar inequívocamente que para la configuración del tipo penal en análisis se requiere la producción de un perjuicio patrimonial.

87. A ello abona la ubicación sistemática del delito de contrato simulado, pues se encuentra incluido en el título XI del Libro Segundo: Crímenes y Simples Delitos contra la Propiedad. Al respecto, si bien no es la propiedad precisamente el bien que se afecta en las defraudaciones patrimoniales, sino el patrimonio, en tanto universalidad jurídica, es en este acápite que se encuentran insertos los delitos de defraudación que regula nuestro Código. Esto es relevante, pues los delitos respecto de los cuales subyace la protección

del patrimonio como bien jurídico, exigen la irrogación de un perjuicio en la víctima para estimarlos consumados.

88. En cuanto a los deslindes del perjuicio de causa se trata, nuestra jurisprudencia se ha pronunciado al respecto afirmando que sería constitutiva de perjuicio, a la luz del 471 N°2 del Código Penal, la afectación del derecho de prenda general de los acreedores. Así, en relación al supuesto consistente en que un deudor -en concreto con quien suscribe el acto respectivo-, fuera de la hipótesis regulada en el tipo de insolvencia punible del 466 del Código Penal, celebra contratos simulados a fin de sustraer bienes de su patrimonio, y así imposibilitar la satisfacción y ejecución de acreencias de sus acreedores, nuestra jurisprudencia ha estimado que sí se configura el delito de contrato simulado del 471 N° 2 del Código Penal. A modo referencial, la Corte Suprema, el fallo Rol 657-2002, de fecha 09 de julio de 2003, afirmó que "el perjuicio, elemento del tipo de esta figura penal, es el efecto que emana precisamente del contrato mendaz mismo y que en el presente caso se produjo, ya que dicho contrato frustró el ejercicio del derecho de prenda general que tenía la acreedora querellante para lograr el cumplimiento de la sentencia que condenaba a la empleadora a satisfacer una prestación laboral adeudada por esta".

89. Por su parte, el sujeto pasivo del delito también puede ser cualquier persona; la víctima no debe revestir una cualidad específica, sino que (y para efectos de su legitimidad en tanto ofendida por el delito) únicamente ser titular del patrimonio que se ve afectado con ocasión del otorgamiento del contrato simulado. Al respecto, y como conclusión evidente de la estructura del delito y de la noción de simulación, el co-otorgante del contrato simulado no puede ser víctima de dicho delito, sino que solo lo pueden ser terceros ajenos al acto suscrito.

90. Respecto del tipo subjetivo del delito, la configuración del contrato simulado únicamente resulta compatible con el dolo directo del sujeto activo, ello en el entendido que la simulación a todas luces exige un acuerdo entre quienes intervienen en el acto.

## COMPETENCIA.

91. Los contratos simulados se planearon, decidieron, aprobaron y ejecutaron en el domicilio del Grupo CGB y Filiales, ubicado en calle Rosario Norte N° 660, piso 23, Las Condes, Santiago.

92. De acuerdo a las reglas generales del Código Orgánico de Tribunales (art. 14 y siguientes), y en particular en artículo 157, este Tribunal es competente para conocer de todas las gestiones previas a que diere lugar el procedimiento previo al juicio oral, dado que dicho lugar se encuentra dentro de su territorio jurisdiccional.

**POR TANTO**, de conformidad a lo dispuesto por los artículos 111 y siguientes del Código Procesal Penal, art. 471 N° 2 del CP; y normas penales pertinentes;

**RUEGO A SS.** tener por interpuesta querella criminal en contra de **ÁLVARO JOSÉ SAIEH BENDECK**, ya individualizado; y en contra de todos aquellos que resulten responsables a título de coautores, cómplices y encubridores; por la comisión de delitos reiterados de otorgamiento de contrato simulado, en grado de consumados y en calidad de autor, del art. 471 N° 2 del Código Penal, y sin perjuicio de la calificación jurídica que en definitiva se haga de los hechos, todo ello de acuerdo a los antecedentes de hecho y de derecho que se han expuesto, declararla admisible y remitir los antecedentes al Ministerio Público, a fin que disponga el inicio de la investigación, lo formalice, acuse y en definitiva, sea condenado al máximo de las penas que establece la ley.

**PRIMER OTROSÍ:** Sírvase SS. tener por acompañada copia digital de escrituras públicas otorgada con fecha 06 de enero de 2023 en la Notaría de don Iván Torrealba Acevedo, en la cual consta mi personería para actuar en representación de MBI CORREDORES DE BOLSA S. A., MBI SERVICIOS FINANCIEROS LTDA., MBI Administradora General de Fondos S.A., MBI DEUDA PLUS FONDO DE INVERSIÓN, MBI DEUDA TOTAL FONDO DE INVERSIÓN, MBI RENTA FIJA PLUS DÓLAR FONDO DE INVERSIÓN, MBI DEUDA LATAM FONDO DE INVERSIÓN y MBI DEUDA PRIVADA FONDO DE INVERSIÓN. En dichas mismas escrituras públicas consta personería de don Sergio Rodríguez Oro.

**SEGUNDO OTROSÍ:** De acuerdo a lo dispuesto por el art. 113 del CPP, vengo en solicitar que el Ministerio Público disponga la realización de las siguientes diligencias de investigación:

1.- Se despache una orden de investigar a la BRIDEC de la Policía de Investigaciones de Chile, a fin que proceda a recopilar todos los antecedentes, documentales y testimoniales, sobre el hecho punible y su autoría;

2.- Se oficie a la Comisión de Mercado Financiero para que remita la totalidad de la información que tenga en su poder -correspondiente a los años 2016 a 2022- de las compañías Corp Group Banking S. A. y Compañía Inmobiliaria y de Inversiones Saga SpA; y del bono ISIN USP31925AD54, denominado Corp Group Banking 13/23.

3.- Se oficie a la ULDECCO de la Fiscalía Nacional a fin que realice un levantamiento patrimonial y societario de la Familia Saieh, cuya cabeza es el querellado Álvaro José Saieh Bendeck;

4.- Se requiera a los representantes de Corp Group Banking S. A. y Compañía Inmobiliaria y de Inversiones Saga SpA, (i) Jorge Andrés Saieh Guzmán, (ii) María Catalina Saieh Guzmán y (iii) Roberto Guerrero del Río, todos domiciliados en calle Rosario Norte Nº 660 piso 23, Las Condes, Santiago, a fin que procedan a hacer entrega voluntaria de una copia de la contabilidad de ambas compañías entre los días 01.ENE.2016 y 31.DIC.2022;

5.- Se oficie al DCV para que informe los titulares -al día 31.DIC.2022- de posiciones en el bono "CGB 13/23" ISIN USP31925AD54.

**TERCER OTROSÍ:** Sírvase SS. tener presente, de acuerdo a lo dispuesto por el art. 31 del Código Procesal Penal, que para efectos de notificaciones señalo los correos electrónicos ccg@cortesyrodriguez.cl y sro@cortesyrodriguez.cl.

**CUARTO OTROSÍ:** Sírvase SS. tener presente que, en mi calidad de abogado habilitado para el ejercicio de la profesión, asumo personalmente el patrocinio y poder en esta investigación; y asimismo asume poder don SERGIO RODRÍGUEZ ORO, Rut Nº 9.909.965-8, de mi mismo domicilio, quien firma en señal de aceptación.

# Exhibit B

**Carlos Cortés and the accusations against a businessman for asset stripping and simulated contracts**

# ATTORNEY FOR PRIVATE PROSECUTION INVESTORS AGAINST ÁLVARO SAIEH: "What we are seeking is justice, criminal punishment and the recovery of money that was paid"

The attorney states that among all the lawsuits filed against the businessman there are between 50 and 60 victims, with damages of around US$ 100 million. He asserts that the Chapter 11 agreement has no legal effect in Chile "given that in order for such, a judgment of acquittal or conviction would be required, which definitely does not exist." • JESSICA MARTICORENA

**B**usinessman Álvaro Saieh has accumulated eight criminal complaints against him. They deal with Chilean investors, creditors of a bond for US$ 50 million that CorpGroup Banking (CGB), controlled by Saieh Group, placed in May of 2013. After falling into default due to not meeting its financial commitments with said bondholders, CGB availed itself of Chapter 11 of the U.S. Bankruptcy Code. The proceeding concluded in June of last year, but today a group of Chilean investors—among which are international management firm MBI, the Moneda Group and businessman Claudio Fischer—accuse Saieh, his children as directors of CGB, and executives, of asset stripping and simulated agreements. Attorney Carlos Cortés, represents six of these criminal complaints. "In all, including all the criminal complaints, we are talking about between 50 and 60 victims, with damages of almost US$ 100 million," Cortés explained.

— On March 27, the American firm that advised CGB in the United States sent you a letter requesting that you cease said actions in Chile, because they would be violating the plan approved in 2022 in the Delaware Court. You answered that you did not understand English. Are you all going to desist from legal action?

"No, because doing that would be in remiss of my professional duties. That was the reason for which I've hired. Look, in the first place, there is a matter of manners. If you need a letter to an attorney in another country, you do so in the the language of the recipient. Second, and more important [is] the legal matter. In order to file documents in Chilean courts, and with the Public Prosecutor's Office, as the first essential requirement, they must be translated, thus, said letter in English has no legal value whatsoever in Chile. I am not going to do their work for them. In the Latam reorganization process, all letters in said proceeding were sent in Portuguese to those living in Brazil, and in Spanish to Chile. Here we are being sent an email, without translation, regarding facts that we do not believe and assertions lacking any validity in Chile. We are not a colony of the District of Delaware. It will be the Public Prosecutor's Office and the Chilean Courts who would be called upon to investigate and judge the facts, and punish this type of conduct."

— Have you had any other communication with the opposing party?

"We have had no contact or communication with the opposing party. They have not sent the document in Spanish."

— Saieh's defense announced that they can exercise legal action in Chile and in the United States against the private prosecutors, they could be accused of contempt or sued for damages.

"That is threatening the victims, and that isn't done. They are not going to intimidate us".

— Álvaro Saieh's attorneys have stated that a judgment has already been issued in the U.S courts, because the creditor bondholders approved the Chapter 11. They state that if there is no bond, there is no amount due. If there is no amount due, there cannot be damages, and without damages, there cannot be a crime.

"One of the effects of national sovereignty is that foreign judgments only take effect in Chile when our legislation so provides. In Chile —for all legal effects— there is no proceeding, nor judgment, nor judicial measure whatsoever with respect to Saieh. Only a criminal case against him, in the Fourth Supervisory Court of Preliminary Proceedings, for a simulated agreement involving stripping CGB's assets".

— Álvaro Saieh's defense attorneys state that the plan approved in 2022 granted a release from liability of all types for the debtors, thus, the civil and criminal aspect was closed. The attorneys claim that the bondholders, within the framework of the agreement, waived criminal action. Is that true?

"The Class 7B creditors, called the non-guaranteed bondholders, opted to not release the debtors and their related companies from any action, whether criminal or civil. This is called Opt-Out, an option that 85.54% of the bondholders took".

"There is no release of liability, that is false. We have been surprised by the defendant's attorneys reporting that falsehood. There is no waiver nor release of liability for fraudulent acts, such as the crimes committed by the Saieh family and their collaborators. The Chapter 11 plan expressly excludes liability for these types of acts. The Class 7B creditors, called non-guaranteed bondholders, who are the Chilean creditors who have filed a private prosecution criminal complaint, opted to not release the debtors and their related companies from any action, whether criminal or civil. This is called Opt-Out, the option taken by 85.54% of the bondholders. Thus, this is not a topic for discussion. In the contrary, it's a closed subject".

— But your clients also received money?

"But they recovered less than 5% of what was invested, and that does not mean that they do not feel they have been swindled".

— Does District Attorney Felipe Sepúlveda have this information?

"Of course. The defendant's strategy of announcing legal action for contempt in order to intimidate the victims is a defense mechanism that is rejected by the entire judicial system. For us it seems very serious that they have the gall to try to criminalize the victims, given one of the most evident and unfounded white collar crimes known to the Chilean criminal justice system".

— Álvaro Saieh's defense also asserts that there was no asset stripping of CBC, as you are accusing, because the transactions between the related companies of the group, that you are questioning, were essential in order for CGB to comply with the principal and underlying obligations of the bond. And they furthermore assert that this subject was discussed within the framework of the Chapter 11 process.

"The asset stripping of the Saieh group is not disputed. So much so, that their attorney, Samuel Donoso, in an interview with your newspaper, stated that 'the objective was, by means of said transactions, by means of cash flow from CGB, to divert the upstream companies of the group to meet their obligations, also guaranteed by CGB, and thus avoid default...'. He is confessing that his clients committed the act for which they are accused: the asset stripping of CGB, they did not buy shares of SAGA, but rather emptied CGB's coffers. And the assertion that this was analyzed in

Delaware is another falsehood. It is not true that it was analyzed and investigated criminally; on the contrary, what is known as Cram Down was applied, that is, the reorganization plan was approved by the judge, but with 85.54% of the creditor bondholders voting against it. The purpose of Chapter 11 is not to investigate unlawful activity, it is simply to achieve the economic continuity of the debtors. Thus, it produces no criminal effect whatsoever, there is no criminal res judicata in Chile nor will there ever be, since for such, a judgment of acquittal or conviction is required, which definitely does not exist."

— In your opinion, what was the purpose of the funds captured by the placement of the CGB bond?

"The leaving of the money will be accurately determined in the criminal investigation carried out by the prosecutor's office and the PDI's Financial Crimes Squad. But there are many behaviors shown by the defendants which create [a sense of] powerlessness. Mr. Álvaro Saieh continues to live with all the grandiose luxuries that one could imagine: a jet costing millions of dollars that he just sold, after the lawsuits were filed against him and received the amount of US$ 28 million—, helicopter, apartment in London; and his son, Jorge Andrés Saieh, in the middle of Chapter 11, acquired an apartment in Miami for a cost of US$ 5 or 6 million. What do you think that is? It's to humiliate the victims to their face. It is due to the amount of the lawsuit, the number of victims and the manner in which these events took place, that the Public Prosecutor, Felipe Sepúlveda, stated to the media that this investigation is symbolic for the Chilean criminal system".

— Your clients, who have decided to file criminal charges, are they seeking money, is Attorney Samuel Donoso indicated?

"We are going to go all the way until justice is done. If someone steals your car, you pursue two things: that the perpetrator of the theft is put in jail, and additionally, for your vehicle to be returned to you. If someone steals millions of dollars from you, it is logical and legitimate to want to punish the perpetrators and recover what was lost, and one of the means to do so is by exercising criminal action. They are not separate things. What we are looking for here is justice from the criminal justice system, that is, jail, for the perpetrators and participants in these crimes: Álvaro Saieh, his family, managers and all those who participated in this transaction. And, of course, we are looking to recover the money that was paid. That is what justice is. It seems to me to be a lack of respect towards the victims to state that they only want money, as one of the defense attorney has said. They are the victims and should be treated as such."

— There are other Chilean companies that have benefited from Chapter 11 [proceedings] in the United States. Is this the only case which blew up with respect to the courts?

"For example, in the case of Latam, the process in the United States was a cross-border bankruptcy proceeding, heard before Civil Court Two of Santiago, the only instance in which an action from a foreign court can exist or take legal effect in Chile. Nothing like that was done in the case of CGB. Instead of a foreign bankruptcy proceeding taking legal effect in Chile, they have unilateralized the victims with criminal cases for having exercised their right. In this case, the 'non-guaranteed bondholders' rejected the proposed plan and reserved all their rights".

— Do you believe that more private prosecutors will join the criminal lawsuit?

"There are three groups of people that may file a criminal lawsuit. The first are the funds, which represent all their investors. In this case, out of fiduciary duty, they have the obligation to file a criminal lawsuit, since it is the correct action for a diligent administrator to take. Second, the direct buyers of the bonds, many of whom have filed criminal lawsuits. In third place are CGB's ex-partners, who, given this diversion of funds to the defendants' personal companies, lost many millions of dollars."

— Are there criminal lawsuits coming?

"There is a group of CGB's ex-partners that are considering the matter of filing a private prosecution criminal lawsuit."

— And what is next in Prosecutor Sepúlveda's investigation?

"Multiple proceedings have been ordered and are in the implementation phase. It is a matter of an investigation that includes a plan that was expected year after year, a system of this type of financial crime, with legal and technical advice. What can be seen as a total disregard for the victims, a similar behaviour carried out with people charging or substituting one for another, whether family members or not. A true plan. This is not a matter of an occasional or one-off thing, is a moment of excessive or botanical crisis. Here there is clear criminal abuse of legal notices, of the structures the controller used to carry out asset stripping of CGB, by means of executing simulated instruments, one after another, with full knowledge that by doing so, the creditors were being defrauded. The investigation is proportionate to the seriousness of said attack .

— What measures have been taken up to now?

"The PDI ordered the recovery of all the contracts. Prosecutor Sepúlveda ordered Finlco to review the accounting, and depositions are being coordinated, that should occur very soon";

— How long do you estimate this investigation will last?

"According to the usual parameters for this type of case, I would estimate another five or six months. A led depends on the dedication given to this investigation by the Financial Crimes Squad of the PDI. They are serious team, and to a great degree, at this time, gathering information is in their hands.



Attorney
Carlos Cortés



## <u>TRANSLATION CERTIFICATION</u>

I, Leonardo Duran, am a qualified professional translator of the Spanish and English languages and am certified by the American Translators Association in Spanish to English translation.

I hereby certify that the attached translation is, to the best of my knowledge and belief, a true, accurate and complete translation from Spanish into English of the attached document.

Interview Carlos Cortes (1055976.1)

El Mercurio Newspaper

Sunday, April 16, 2023

Verify at www.atanet.org/verify

Leonardo Duran
_____
Leonardo Duran

08/18/2023
_____
Date

**Magna Legal Services**
Language Services Division
1635 Market Street | 7 Penn Center, 8th Floor | Philadelphia, PA 19103
**Phone:** 866-624-6221 | **Fax:** 866-579-0819
**Email:** LanguageServices@magnals.com | **Web:** www.magnals.com

## FLORIDA ACKNOWLEDGMENT

State of Florida )

County of Miami-Dade )
)

On 08/18/2023 before me, Mercedez G Robinson , by means of

Date                                    Notary Name

❑ Physical Presence -- OR --

☑ Online Notarization,

personally appeared Leonardo Duran

*Name(s) of Signer(s)*

❑ personally known to me -- OR --

❑ proved to me on the basis of the oath of _____ -- OR --

*Name of Credible Witness*

☑ proved to me on the basis of satisfactory evidence: ***Provided Driver License***

*Type of ID Presented*

to be the individual(s) whose name(s) is/are subscribed to the within instrument, & acknowledged to me that they executed the same in their authorized capacity(ies) and by proper authority, and that by their signature(s) on the instrument, the individual(s), or the person(s) or entity upon behalf of which they acted, executed the instrument for the purposes and consideration therein stated.

WITNESS my hand and official seal.

MERCEDEZ G ROBINSON
Notary Public - State of Florida
Commission # HH 83897
Expires on December 13, 2024

Notary Public Signature: _____

Notary Name: Mercedez G Robinson

*Notarized online using audio-video communication*

## DESCRIPTION OF ATTACHED DOCUMENT

Title or Type of Document: Translation CertificationLeonardo Duran

Document Date: 08/18/2023           Number of Pages (w/ certificate): 2

Signer(s) Other Than Named Above: N/A

| **Capacity(ies) Claimed by Signer(s)** | **Capacity(ies) Claimed by Signer(s)** |
|---|---|
| Signer's Name: Leonardo Duran | Signer's Name: |
| ❑ Corporate Officer  Title: _____ | ❑ Corporate Officer  Title: _____ |
| ❑ Partner – ❑ Limited ❑ General | N/A ❑ Partner – ❑ Limited ❑ General |
| ☑ Individual ❑ Attorney in Fact | ❑ Individual ❑ Attorney in Fact |
| ❑ Trustee ❑ Guardian of Conservator | ❑ Trustee ❑ Guardian of Conservator |
| ❑ Other: _____ | ❑ Other: _____ |
| Signer Is Representing: Leonardo Duran | Signer Is Representing: _____ |

( 2 )

# Exhibit B-1

**Carlos Cortés y las acusaciones contra el empresario por vaciamiento patrimonial y contratos simulados**

# ABOGADO DE INVERSIONISTAS QUERELLANTES CONTRA ÁLVARO SAIEH: "Lo que se busca es justicia, castigo penal y recuperar el dinero entregado"

El abogado asegura que entre todas las querellas presentadas contra el empresario hay entre 50 y 60 víctimas, con un perjuicio cercano a los US$ 100 millones. Sostiene que el acuerdo del Capítulo 11 no produce efecto penal alguno en Chile, "ya que para ello se requiere una sentencia absolutoria o condenatoria, lo que de infinitivamente no existe". — JESSICA MARTICORENA

O cho querellas acumuladas en contra del empresario Álvaro Saieh. Se trata de inversionistas chilenos acreedores del banco por US$ 500 millones que CorpGroup Banking (CGB), perteneciente al grupo Saieh, adeuda a un grupo de inversionistas chilenos.

El 27 de marzo, el bufete americano que asesora a Estados Unidos a CGB le envió a usted una carta solicitándole que cesara de las acciones en Chile, pues con ellas estarían violando el plan aprobado en 2022 en la corte de Delaware. Usted les contestó que eso entendía ilegible. ¿Vea a desistir de las acciones legales?

—"No, porque eso sería faltar a mi obligación profesional. Pero eso me contestaron...



El abogado
Carlos Cortés.

—Pero sus representados igual recibieron dinero.

—Hay otras empresas chilenas que se han acogido al Capítulo 11 en Estados Unidos. Este es el único caso que explícitamente...

—¿Usted cree que se sumarán más querellantes a la causa penal?

—¿Vienen más querellas?

—¿Qué viene ahora en la investigación del Fiscal Sepúlveda?

—¿Qué diligencia se han realizado hasta ahora?

—¿Cuánto tiempo calcula usted que durará esta investigación?